Ronald RANDOLPH and Phillip A. Stewart, Appellants,

v.

UNITED STATES, Appellee.

Nos. 02–CF–110, 02–CF–442.

District of Columbia Court of Appeals.

Argued Feb. 15, 2005.

Decided Sept. 1, 2005.

Thomas T. Heslep, Washington, DC, appointed by the court, for appellant Ronald Randolph.

Thomas L. Dybdahl, Public Defender Service, with whom James Klein and Jaclyn S. Frankfurt, Public Defender Service, were on the brief, for appellant Phillip A. Stewart.

L. Jackson Thomas II, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney, and John R. Fisher, Roy W. McLeese III, Elizabeth Trosman, D. Ames Jeffress, and David J. Gorman, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge,* SCHWELB, Associate Judge, and KERN, Senior Judge.

SCHWELB, Associate Judge:

On November 15, 2001, a jury convicted Ronald Randolph and Phillip A. Stewart of first-degree murder while armed,[1] kidnapping,[2] possession of a firearm during a crime of violence (PFCV),[3] and carrying a pistol without a license (CPWOL).[4] The case arose from the abduction and subsequent murder of Carlos Thomas on the

---

* Chief Judge Washington was an Associate Judge of the court at the time this case was argued. His status changed to Chief Judge on August 6, 2005.

1. D.C.Code §§ 22–2101, –3202 (2001) (premeditated murder while armed); §§ 22–2401.1(b), –3202 (2001) (felony murder while armed).

2. D.C.Code § 22–2001 (2001).

3. D.C.Code § 22–4504(b) (2001).

4. D.C.Code § 22–4504(a) (2001).

night of October 19, 1999. On appeal, both defendants contend that the trial judge abused his discretion and committed reversible error by admitting into evidence an out-of-court narrative statement allegedly made by John Holmes. Holmes, who claimed to have been an eyewitness to the kidnapping of the decedent, made this statement to his friend, Edna Sudler, a prosecution witness, shortly after the kidnapping occurred.[5]

In its initial brief, the government contended that even if Holmes' statement, admitted over objection, was not an excited utterance—an assumption which the government did not contest—the convictions should be affirmed because the evidence was admissible as a prior identification or, in the alternative, as a prior consistent statement. We disagree with the government's position regarding either theory of admissibility. We also note that in its original submission, the government made no claim that any error in the admission of Holmes' out-of-court statement was harmless in the traditional sense.[6] The government thus initially provided the court with no basis for affirmance other than the "prior identification" or "prior consistent statement" theory.

Following oral argument, however, the court ordered supplemental briefing on an issue not previously addressed by the government, namely, whether the court may or should find the error harmless vis-a-vis either defendant when the government had failed to make such a claim in its brief. Having considered the supplemental submissions in the light of the record as a whole, including the government's initial failure to assert a claim of harmlessness, we now conclude that the trial judge erred in admitting testimony regarding Holmes' out-of-court statement, and that the error was prejudicial as to Randolph but harmless as to Stewart.[7] Accordingly, we reverse Randolph's convictions for armed first-degree murder, kidnapping, and PFCV, but affirm his conviction of CPWOL, because that conviction was not affected by the trial court's erroneous ruling. We affirm all of Stewart's convictions.

## I.

### THE EVIDENCE [8]

On the afternoon of October 20, 1999, officers of the Metropolitan Police Department found the body of Carlos Thomas at an abandoned public housing development in southeast Washington, D.C. Thomas had four gunshot wounds to his head, and he had been dead for approximately twenty-four to thirty-six hours. The govern-

---

**5.** During the prosecution case, Holmes testified that he witnessed the abduction and that it was the defendants who kidnapped Thomas. During the defense case, Holmes testified that he knew nothing about the kidnapping and that his testimony for the prosecution was false. Prior to trial, Holmes also made various contradictory statements. See note 12, *infra*.

**6.** By a claim of "traditional" harmless error, we mean a contention that even if the trial court erred, the error did not affect the outcome of the trial sufficiently to warrant reversal of the conviction.

**7.** In its initial brief, the government did not contend that if Holmes' statements to Ms. Sudler should not have been received in evidence at all, then the error in admitting them was harmless.

**8.** Randolph and Stewart were convicted following an unusually lengthy trial which began on October 9, 2001, and concluded when the jury returned its verdict on November 15 of the same year. In this opinion, we describe only those portions of the evidence that are relevant to our disposition of the issues on appeal.

ment's theory of the case was that Thomas was abducted by Stewart and Randolph—an incident allegedly witnessed by Holmes—and that the two men murdered Thomas a few hours later. There were no witnesses to the shooting itself.

Holmes was the prosecution's key witness, but his testimony must be placed in the context of the overall investigation. On October 22, 1999, police officers went to the southeast Washington apartment of Patricia Ball and her daughter, Kwatika Johnson. Kwatika was the then-pregnant girlfriend (and later became the wife) of appellant Stewart. Kwatika testified that she had been on the telephone with her friend Tracey Johnson (no relation), when Stewart, armed with a revolver, pointed the weapon at Kwatika's head and stomach and threatened that "I'm going to put three bullets in your head like I did Carlos Bitch Ass," or words to that effect. Stewart, who was intoxicated, apparently threatened Kwatika Johnson and her unborn child because, on account of her pregnancy, Kwatika did not want to have sex with him.

Tracey Johnson, who was called as a witness by Stewart's attorney, and who had no apparent reason to level a false accusation against Stewart, testified that she overheard Stewart's threat and admission, and she reported what she had heard immediately to her grandmother. The two women called the police.[9] Police officers responded to Ms. Ball's apartment and arrested Stewart, who was on the premis-

es. Kwatika led them to the .38 caliber revolver which Stewart had pointed at her, and which he had later concealed. Ballistic tests subsequently established that Carlos Thomas had been shot with the weapon which the officers recovered from Ms. Ball's apartment—*i.e.*, the revolver which Stewart had allegedly used to threaten Kwatika.[10]

Later on the evening of October 22, homicide detectives brought Kwatika Johnson to the police station for questioning regarding the murder of Carlos Thomas. Initially, Kwatika did not disclose to the police Stewart's acknowledgment to her that he had shot Carlos, but the detectives had already obtained information to this effect as a result of Tracey Johnson's report. As noted in the government's brief, "Kwatika only told the detectives what Stewart had said about Carlos Thomas when they were about to arrest her as an accessory to murder." According to Kwatika, the police also threatened to take away her children unless she provided the information that they were seeking. Following these pointed police warnings, Kwatika gave the detectives a videotaped statement in which she asserted that while threatening to kill Kwatika, Stewart boasted that he had shot Carlos three times.[11] Kwatika subsequently gave a statement to Stewart's attorneys in which she denied that Stewart had admitted killing Thomas. At trial, however, Kwatika (who had meanwhile been placed in the Witness Protection Program and had received a substantial amount of money from the

9. Tracey also apparently inquired, in talking to one of the officers, whether anyone named Carlos had been murdered. One of the prosecutors referred to this question by Tracey in the government's rebuttal argument. The parties have not identified the pages of the transcript in which this testimony appears, and we have been unable to find any reference to it.

10. Kwatika testified that on October 20, 1999, the day that police recovered Carlos Thomas' body, and two days before Stewart threatened Kwatika with the revolver, she had seen Ronald Randolph hand the weapon to Stewart. At that time, Kwatika had no knowledge that a murder had been committed.

11. In reality, Thomas was shot four times.

government) confirmed that Stewart had threatened her and that, at the same time, he had admitted abducting and shooting Carlos.

On or about March 1, 2000, some four months after obtaining Kwatika Johnson's statement, the police located John Holmes, the sole alleged eyewitness to the abduction. Holmes, a heavy drinker, initially told the police that he knew nothing about the death of Carlos Thomas, but he then changed his story, stating that he had witnessed a kidnapping.[12] Holmes later testified that he knew Thomas, and that he was also friendly with Stewart and Randolph, each of whom knew him as "Pop" or "Pops."

At trial, Holmes was initially called as a witness for the prosecution. Holmes testified that on the evening of October 19, 1999, he was visiting and drinking with his friend, Edna Sudler. Ms. Sudler asked him to go to Eddie Leonard's Carry–Out to purchase some cigarettes for her. Holmes stated that after he arrived at Eddie Leonard's, he saw Carlos Thomas arrive and order some food. The two men left together. As they emerged from the establishment, a rust-colored car pulled up, and the driver, identified by Holmes as appellant Randolph, stepped out and ordered Thomas to get into the car. According to Holmes, Randolph put his hand near his waist area, as if to draw a weapon, and Thomas got into the vehicle. Seated in the rear of the car was appellant Stewart. The driver then made a U-turn and drove off at a high rate of speed. Holmes testified that he returned to Ms. Sudler's apartment, drank a beer, and went to sleep.[13]

Edna Sudler, whom Holmes was visiting on the evening of October 19, 1999, was also called to testify on behalf of the prose-

---

**12.** This was not the last of Holmes' self-contradictions. Counsel for Stewart points out in his reply brief that

> [w]hat we know about Mr. Holmes, from the evidence adduced at trial, is this: (1) When he first spoke to police some four months after the incident, he denied seeing anything. Then, after some interrogation, he changed his story and said he had seen a kidnapping.... (2) When he first testified before the Grand Jury, he lied, primarily about not knowing the driver. He subsequently changed his story. (3) He told a Public Defender Service (PDS) investigator on October 12, 2001, that he had seen nothing of the original incident; then he testified in the government's case on October 16–17, 2001, that he saw the incident and knew both the driver and the passenger; and finally he testified in the defense case on November 5, 2001, that on the night of the incident he "did not see these young men [Mr. Stewart and Mr. Randolph]."

(Citations to transcript omitted.) Stewart argues that "[t]hese repeated reversals left his reliability in tatters."

**13.** Holmes also testified as a defense witness on behalf of Stewart. During his second appearance on the witness stand, Holmes reiterated that he had gone to the carry-out to buy cigarettes, but he denied seeing anyone there. Holmes testified that he returned to Ms. Sudler's apartment without seeing either Stewart or Randolph. On cross-examination by the prosecutor, Ms. D. Ames Jeffress, Holmes stated:

> The first two times, Ms. Amy, I'm going to tell you again, I lied on them boys. I can't lie no more. I'm going to tell you over and over and over, I tell you all day long, I didn't see them, and I didn't see no Carlos.... No, no, nobody. I lied on them, your Honor, and that's the God's honest truth just to get twenty or forty dollars because I was hungry.

Holmes explained that he had lied to the police and to the court because he was unemployed and homeless, and because he wanted to receive witness fees.

The government sought to show that Holmes' testimony for the defense, in which he exculpated the defendants, was the result of threats he had received from a man known as "Dog." Holmes denied that he had been threatened by Dog.

cution. Ms. Sudler stated that Holmes had consumed a great deal of alcohol and that it did not "take that much for [him] to get drunk." Ms. Sudler further acknowledged that on the evening in question, she had consumed some gin, chased it down with beer, and was "half-drunk" herself. Over a defense hearsay objection which the trial judge overruled, Ms. Sudler described what Holmes had told her after he returned to her apartment from Eddie Leonard's. According to Ms. Sudler, Holmes reported that he had seen and conversed with Carlos Thomas at the carry-out. He related that after the two men had made their purchases,

> he and Carlos came out together and this car pulled up real fast in front of the carry-out and a guy got out of the car and said Carlos, what's up like that, man. So Carlos said what's up like that with you. So he said come on. We going for a ride. And the dude got out of the car and made Carlos get in.

Ms. Sudler further testified that she asked Mr. Holmes if he knew the men who were responsible for abducting Mr. Thomas. Holmes told her that he had never seen them before but, according to Ms. Sudler, "he was lying." Sustaining a defense objection, the judge ordered stricken Ms. Sudler's comment that Holmes was lying. Ms. Sudler went on to state that she "picked" at Mr. Holmes—"[i]t's like you trying to get something out of a child and eventually they tell you"—and that Holmes told her who the men were. The prosecutor did not seek to elicit, and Ms. Sudler did not disclose, the names of the men Holmes had identified.

There were a number of other prosecution witnesses, including, in particular, Kwatika Johnson, who testified as previously noted. Both defendants called witnesses, but neither Stewart nor Randolph took the stand in his own defense. The defendants were subsequently convicted of armed first-degree murder and a number of related offenses. See pp. 212–13, *supra.*

## II.

## LEGAL ANALYSIS

Each appellant contends on appeal that the judge committed reversible error by admitting, as an excited utterance, Holmes' alleged statements to Ms. Sudler as described in her testimony. The issue comes before us in an unusual posture, for the government does not defend on the merits the trial judge's ruling that Holmes' report to Ms. Sudler was an excited utterance, thereby effectively conceding error. *See generally [John L.] Rose v. United States,* 629 A.2d 526, 535–38 (D.C.1993). Although the government has not formally confessed error in this case, and has not asked the court to reverse the defendants' convictions, its numerous concessions on this and other issues come close to inviting reversal. Under the circumstances, we make our own inquiry regarding whether error occurred, for "we cannot ... quit ourselves of our responsibility to examine the whole record before setting aside a conviction for crime." *Parlton v. United States,* 64 App. D.C. 169, 170, 75 F.2d 772, 773 (1935).

A. *The hearsay exception for excited utterances.*

■ In *Nicholson v. United States,* 368 A.2d 561, 564 (D.C.1977), the court stated that the

> [e]lements necessary to justify the exception to the hearsay rule include (1) the presence of a serious occurrence which causes a state of nervous excitement or physical shock in the declarant, (2) a declaration made within a reasonably short period of time after the occur-

rence so as to assure that the declarant has not reflected upon his statement or premeditated or constructed it, and (3) *the presence of circumstances, which in their totality suggest spontaneity and sincerity of the remark. See generally* McCormick, Evidence § 297 (2d ed. 1972).

(Emphasis added.) "The ultimate question ... is whether the statement, as reported at trial, was a spontaneous reaction to the exciting event[,] rather than the result of reflective thought." *Lyons v. United States,* 622 A.2d 34, 47 (D.C.1993) (citation and internal quotation marks omitted), *vacated on other grounds,* 650 A.2d 183 (D.C.1994) (en banc).

In this case, the appellants argue principally that because, in his statements to Ms. Sudler, Holmes claimed not to know who the kidnappers were, and because he subsequently testified in the prosecution case at trial that the kidnappers were the two appellants, then under the prosecution's own theory, Holmes must have both reflected and lied in the account that he gave to Ms. Sudler. "The fact that the complainant/declarant misrepresented a fact to the police [14] during the 911 call was relevant to a determination of whether it was a spontaneous utterance. It bears upon whether the declarant's statement resulted from conscious reflection or the spontaneous reaction to the startling event." *[Raphael] Smith v. United States,* 666 A.2d 1216, 1225 (D.C.1995) (citations omitted).

■ The court in *[Raphael] Smith* found it unnecessary to decide whether evidence that the declarant fabricated parts of his statement conclusively established as a matter of law that the statement was not an excited utterance. Nevertheless, fabrication presupposes re-

flection rather than spontaneity and falsity rather than truthfulness. An excited utterance is admitted on the theory that its spontaneity assures its veracity, and fabrication obviously tends to undermine the applicability of that theory. Indeed, the government does not argue to the contrary.

### B. *Standard of review.*

Both defendants objected to Ms. Sudler's testimony regarding Mr. Holmes' account of events outside the carry-out on hearsay grounds, and defense counsel engaged the trial judge in a protracted discussion of the issue. When Ms. Sudler reported that Holmes initially claimed not to know who the kidnappers were, however, neither defense attorney raised the precise issue whether the inconsistency between what Holmes allegedly told Ms. Sudler on October 19, 1999, on the one hand, and Holmes' own testimony for the prosecution at the trial on the other, removed the basis for the admission of an excited utterance, namely, spontaneity, reliability, and lack of opportunity to fabricate. Counsel's failure to make this specific objection raises the question whether the "fabrication undermines the exception" theory is a "claim," which if not asserted in the trial court, is subject to the "plain error" standard on appeal, or whether it is simply a new argument in support of the preserved claim of hearsay; if we are dealing with an argument rather than a claim, it may properly be asserted for the first time on appeal. *See West v. United States,* 710 A.2d 866, 868 n. 3 (D.C.1998) (quoting *Yee v. Escondido,* 503 U.S. 519, 534, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992)) ("Once a ... claim is properly presented [to the trial court], a party can make any argument [in the appellate court] in support of that claim; parties are

14. Or, in this case, to a private citizen.

not limited to the precise arguments made below.").

We need not resolve this question, however, for the government has deliberately decided not to argue that the plain error standard applies. In its brief, the government states:

> For present purposes, we assume that the timing of the disclosure of the fabricated portion of Holmes's statement relieves appellants of the burden of demonstrating plain error and subjects that aspect of their claim to harmless-error review. *See (Raphael) Smith*, 666 A.2d at 1224–1226 (where hearsay testimony was admitted as an excited utterance, and testimony subsequently revealed a false aspect of the declaration, defendant was not required to show plain error, even though defendant failed to complain in the trial court).

The government's decision not to contest this issue as to the applicable standard of review was not at all unreasonable, and we accept the government's concession for purposes of this case. [*John L.*] *Rose*, 629 A.2d at 535–38.

Further, the government effectively concedes, by not contesting the point, that the trial court's ruling in this case that Holmes' statement to Ms. Sudler was an "excited utterance" was erroneous. In response to Stewart's argument heading that "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ADMITTING JOHN HOLMES' ALLEGED STATEMENTS TO EDNA SUDLER INTO EVIDENCE AS EXCITED UTTERANCES," and Randolph's claim that "ADMISSION OF THE TESTIMONY OF EDNA SUDLER, TO BUTTRESS HOLMES' TESTIMONY[,] WAS REVERSIBLE ERROR," the government asserts only that "EVEN IF THE TRIAL COURT ERRED BY ADMITTING HOLMES'[ ] STATEMENTS TO MS. SUDLER AS AN EXCITED UTTERANCE, THE ERROR DOES NOT WARRANT REVERSAL."[15] In the government's brief on the merits, its sole basis for the claim that reversal is not warranted was that the statements were admissible under two other hearsay exceptions. We therefore turn to the applicability *vel non* of these exceptions to the case at hand. According to the government, Holmes' description of the events of October 19, 1999, as reported by Ms. Sudler in her testimony, was admissible as a prior identification or, in the alternative, as a prior consistent statement.

 In general, an appellate court may affirm a judgment on any valid ground. *See, e.g., Ibn–Tamas v. United States*, 407 A.2d 626, 636 n. 17 (D.C.1979). "It is well settled that an appellate court may affirm a decision for reasons other than those given by the trial court." *Purce v. United States*, 482 A.2d 772, 775 (D.C.1984). Affirmance on other grounds is appropriate, however, only where there has been no procedural unfairness. *See, e.g., In re Walker*, 856 A.2d 579, 586 (D.C. 2004) (per curiam); *1137 19th St. Assocs. v. District of Columbia*, 769 A.2d 155, 161 (D.C.2001). In other words, the appellant must have had a reasonable opportunity to be heard with respect to the reasoning on which the proposed affirmance is to be based and, where appropriate, he must have been afforded the opportunity to make an appropriate record in the trial court. Moreover, where, as in this case, we are dealing with evidentiary issues which are confided to the discretion of the trial court, affirmance on an alternate ground is difficult to defend:

---

**15.** If the government had chosen to argue on appeal that Mr. Holmes' statement was an excited utterance, it is questionable, to say the least, whether a proper foundation was laid.

"The essence of [discretionary] decision-making is the trial court's judgment in exercising that discretion," *(James) Johnson v. United States,* 398 A.2d 354, 361 (D.C.1979), for a discretionary decision is based not only on hard facts but also—and often more importantly—on perceptions of demeanor[,] or the pace of the trial, and, ultimately, of the probable impact of counsel and witnesses on the jury. The parties, therefore, are entitled to have the trial judge exercise that discretion, unfettered by erroneous legal thinking (citation omitted); they need not settle for the substituted judgment of an appellate court that would sustain the ruling on a plausible, alternative ground without benefit of all the data, derived from perceptions at trial, that inherently go into a discretionary ruling. (Citation omitted.) Were an appellate court to substitute its own judgment, the court would rationalize a result which the trial court itself, properly informed of the law, might not have reached, given factors at trial which the appellate court could not possibly perceive.

*Wright v. United States,* 508 A.2d 915, 919–20 (D.C.1986).

The hearsay exceptions on which the government now relies are both set forth in D.C.Code § 14–102(b) (2001), which provides in pertinent part as follows:

A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is ... (2) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive, or (3) an identification of a person made after perceiving the person. Such prior statements are substantive evidence.

We address each exception in turn.

### C. *Prior identification exception.*

■■ The government argues that the evidence it introduced under an "excited utterance" rubric could and should have been admitted as a prior identification. Even if there were potential substantive merit to this theory, which there is not, we entertain some doubt as to whether it would be procedurally fair to the appellants to decide the issue on the present record. "The law is clear that the [prosecutor] and the trial court, not the ... appellant[s], had the legal responsibility to clarify the basis for admitting testimony, over objection, that otherwise was inadmissible hearsay." *In re Ty.B.,* 878 A.2d 1255, 1264–65 (D.C.2005) (quoting *Patton v. United States,* 633 A.2d 800, 809 (D.C. 1993) (per curiam)). Had this ground for admission been asserted by the prosecution in the trial court, the defense attorneys could have, and surely would have, refocused their questioning of the witness and their arguments to the trial court accordingly. Moreover, in cases involving alleged prior identifications, as in other cases, "decisions as to the admissibility of evidence generally are left to the sound discretion of the trial judge." *Sparks v. United States,* 755 A.2d 394, 402 (D.C. 2000). Here, the trial judge had no opportunity to exercise his discretion on this issue, for the point was not presented to him.

In any event, the prior identification exception cannot apply because the challenged testimony contained no identification. The purported "identification," in its entirety, was as follows:

Q: Did Mr. Holmes tell you who it was he saw do this to Carlos?

A: He—I said, Greenwood [Mr. Holmes' nickname] do you know who the guys were[?] He said I've never seen them before but he was lying....

THE WITNESS: I said did you know them [the kidnappers][?]

THE COURT: Did you know them[?]

THE WITNESS: He said no, he never seen them before.

In Ms. Sudler's testimony regarding Mr. Holmes' account, the abductors were never described as anything other than two "dudes" or "guys." Holmes provided no information regarding their race, color, height, weight, physical characteristics, or clothing, and he claimed not to know their names. As counsel for Stewart argue in their reply brief, "Mr. Holmes' statement would more accurately be characterized as a statement of 'non-identification.' " [16]

We recently observed that the prior identification exception "applies to statements of identification, but not to detailed accounts of the actual crime." *Brown v. United States*, 840 A.2d 82, 89 (D.C.2004). The statement here at issue presents the precise converse of what is permitted under *Brown*; it provides details of the crime, but no identification of the culprits. The judge could not reasonably have concluded that Holmes' statement to Ms. Sudler was one of prior identification. *A fortiori*, it would not have been an abuse of discretion for the trial court to decline to admit the statement on that ground.

## D. *Prior consistent statement.*

■ The government's alternate theory—that Holmes' account to Ms. Sudler would have been admitted as a prior consistent statement—is also untenable. The prime issue in the case was the identity of the kidnappers, who were also alleged to be the murderers. In his testimony for the prosecution, Holmes declared that he knew the men who abducted the decedent, and he identified them as Randolph and Stewart. In the purported prior consistent statement, as we have seen, Holmes declared that he had never seen the two men before and that he did not know them. Holmes' declaration to Ms. Sudler therefore provided a sound basis for the defense to impeach Holmes with a prior *inconsistent* statement. To suggest that the two statements are consistent is equivalent to arguing, with respect to the main point at issue, that no means yes.

In the trial court, the prosecutor had also argued that Holmes' account could properly be admitted as a prior consistent statement. The trial judge responded emphatically: "No, no, no prior consistent statement!" We agree with the judge and, in any event, his ruling assuredly was not an abuse of discretion.

## E. *Harmless error analysis.*

### (1) *The court's post-argument order.*

For the foregoing reasons, Holmes' statements to Ms. Sudler were not admissible under either of the hearsay exceptions on which the government relies on appeal. In the government's brief on the merits, its sole theory of harmless error was that the statement was admissible under one or both of these exceptions. Further, the government did not initially assert that the *erroneous* admission of these statements would be harmless. Under

---

**16.** It is sometimes useful to have a dictionary around. *Riggs Nat'l Bank v. District of Columbia*, 581 A.2d 1229, 1235 (D.C.1990). The first meaning of "identification" is "act of identifying"; "identify" means "to recognize or establish as being a particular person or thing." The American College Dictionary 599 (1951 ed.). The principal meaning of "identify" is "[t]o prove the identity of (a person or thing)." Black's Law Dictionary 761 (8th ed. 1990). Holmes' statements do not satisfy these definitions.

these circumstances the judge's ruling that the statements were admissible under the "excited utterance" hearsay exception was arguably prejudicial rather than harmless error, and this was true as to both defendants.

Nevertheless, the government's failure to assert that any error was harmless does not necessarily and conclusively end the matter. D.C.Code § 11–721(e) (2001) provides:

> On the hearing of any appeal in any case, the District of Columbia Court of Appeals shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties.

"The command of D.C.Code [ ] § 11–721(e) is that we disregard any nonconstitutional error which does not affect a substantial right of the accused." *Arnold v. United States,* 358 A.2d 335, 341 (D.C.1976) (en banc). Similarly, Rule 52(a) of the Superior Court's Rules of Criminal Procedure provides:

> *Harmless error.* Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

At the conclusion of oral argument, it was not at all clear to the court, especially as to Stewart, whether the error in admitting the hearsay statement "affect[ed] substantial rights" within the meaning of § 11–721(e) and Rules 52(a), or whether reversal was warranted in light of the phrasing of these provisions. Accordingly, and after careful consideration, we ordered the parties to file supplemental post-argument submissions addressing essentially the following questions:

1. whether the government has waived any claim that the error in admitting Ms. Sudler's testimony regarding Mr. Holmes' out-of-court statement was harmless;

2. if so, whether this court has the authority, notwithstanding the government's waiver, to rule that the error was harmless; and

3. if this court has such authority, whether we should exercise it here and hold that the error was in fact harmless in this case.

We turn now to the issues addressed in counsel's post-argument submissions.

*(2) The legal context.*

In their opening briefs, both appellants affirmatively asserted that the trial judge's error in admitting Ms. Sudler's testimony regarding Holmes' out-of-court statement was not harmless. According to Randolph, "it cannot be said that the situation surrounding Ms. Sudler's testimony was harmless. Her testimony was the main buttressing element to the inculpatory version given by Mr. Holmes." Stewart argued that the admission of Holmes' statement to Ms. Sudler was not harmless because, *inter alia,*

> [i]f nothing about this alleged conversation had been admitted into evidence, the jury would have heard only that Mr. Holmes first spoke to the police more than four months after the incident, that he originally denied knowing anything about the kidnapping, but that after speaking to detectives for a time he said he knew the passenger in the car. Some four months after that, he said he knew the driver. Then, immediately prior to the trial, he told a PDS investigator that he knew nothing about the killing of Mr. Thomas. The next week, he testified for the prosecution at trial consistent with his testimony in his second appearance before the Grand Jury, but when called by the defense he reverted to his original story about not

seeing anything related to the kidnapping of Mr. Thomas.

Because of the erroneous admission of this alleged conversation, however, the government could claim that Mr. Holmes told Ms. Sudler some of what he saw immediately following the incident at Eddie Leonard's, and eventually told her he knew who the perpetrators were. But he did not want to get involved, so he said nothing to the police. Then, after his truthful testimony for the prosecution, he was threatened by Dog, and that was why he recanted.

In its brief, the government made no response to these contentions, and argued only that the evidence could, should, and would have been admitted under either of the two other previously mentioned hearsay exceptions—a theory that we have rejected.

■ The government's failure to claim harmlessness even after appellants had preemptively raised the issue in their opening briefs arguably waived the point. [*John L.*] *Rose*, 629 A.2d at 535–38. But there are circumstances under which a waiver can be waived, *In re T.L.*, 859 A.2d 1087, 1090 n. 6 (D.C.2004), or otherwise excused. In construing Rule 52(a) of the Federal Rules of Criminal Procedure, which is identical to the corresponding Superior Court Rule, and consistent with § 11–721(e) and with its federal statutory counterpart,[17] federal appellate courts have concluded that affirmance on harmless error grounds may be proper even where the government has failed to assert that the error was harmless. In *United States v. [Jamie] Rose*, 104 F.3d 1408, 1414 (1st Cir.1997), for example, the court stated:

> We join several other circuit courts of appeals in holding that appellate courts have the discretion on direct appeal to overlook the government's failure to argue that the admission of the challenged evidence, if error, was harmless, and that appellate courts may therefore consider the issue of harmlessness *sua sponte. Horsley v. Alabama*, 45 F.3d 1486, 1492 n. 10 (11th Cir.1995); *United States v. Langston*, 970 F.2d 692, 704 n. 9 (10th Cir.1992); *Lufkins v. Leapley*, 965 F.2d 1477, 1481 (8th Cir.1992); *United States v. Pryce*, 291 U.S.App. D.C. 84, 938 F.2d 1343, 1348 (D.C.Cir. 1991) (opinion of Williams, J.);[18] *United States v. Giovannetti*, 928 F.2d 225, 227 (7th Cir.1991).

---

**17.** The federal analogue to § 11–721(e) is 28 U.S.C. § 2111, which provides:

> *Harmless error.* On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties.

Although the majority of the federal appellate courts that have addressed this issue have analyzed it by construing Rule 52(a), *see, e.g., United States v. Giovannetti*, 928 F.2d 225, 227 (7th Cir.1991), 28 U.S.C. § 2111 is also applicable. *See United States v. Pryce*, 291 U.S.App.D.C. 84, 92, 938 F.2d 1343, 1351 (1991) (Randolph, J., concurring) ("Since 1919 federal courts have been constrained to disregard trial errors not affecting substantial rights . . . .") (citing 28 U.S.C. § 2111).

**18.** In a concurring opinion in *Pryce*, Judge Randolph expressed the view that the court is *required* to apply the harmless error rule notwithstanding the government's failure to invoke it:

> [To] find a "waiver" here one must assume the government possesses some "right." The harmless error doctrine is not so framed; it instructs courts when to affirm convictions despite mistakes at trial.

291 U.S.App.D.C. at 92, 938 F.2d at 1351. Although Judge Randolph's view arguably finds support in the text of 28 U.S.C. § 2111 and Rule 52(a), it has not been adopted by any of the federal appellate courts, and we agree with the apparently unanimous position of those courts that the decision whether to treat the point as waived, and thus as conceded, is a discretionary call.

We agree with these courts, and we hold that, as an appellate court, this court has the authority to find trial court error harmless notwithstanding the government's failure to claim harmlessness.

 Nevertheless, this authority must be exercised with restraint. "Such self-restraint on our part is a corollary of our adversarial system, in which 'appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.'" [*John L.*] *Rose*, 629 A.2d at 536–37 (quoting *Carducci v. Regan*, 230 U.S.App. D.C. 80, 86, 714 F.2d 171, 177 (1983) (Scalia, J.)). We conclude that where, as here, the government has failed to claim in timely fashion that erroneous admission of hearsay evidence was harmless in the traditional sense, we should apply the harmless error doctrine only when harmlessness is obvious. *See, e.g., United States v. Torrez–Ortega*, 184 F.3d 1128, 1136 (10th Cir. 1999) (declining to go behind waiver where harmlessness is, at best, debatable). "If we elect to review the record *sua sponte,* our review [should] err [if at all,] on the side of the criminal defendant." *United States v. Montgomery*, 100 F.3d 1404, 1407 (8th Cir.1997).

### (3) *Randolph.*

 We conclude that in Randolph's case, the issue of harmlessness is at least debatable, and that the government should not be relieved of its waiver. The case against Randolph, who was not arrested until more than half a year after Thomas' murder, is substantially weaker than the case against Stewart. There is no evidence that Randolph confessed to the crime as Stewart allegedly did, and the on-and-off identification of Randolph by Holmes was not "obviously" reliable.

To be sure, Kwatika Johnson testified that on the day after the abduction, she saw Randolph in possession of a revolver which was later identified as the weapon with which Carlos Thomas was shot to death (and with which Kwatika herself was threatened by Stewart). Although at various times, Kwatika gave conflicting versions of various events, the jury had a right to believe her testimony that Randolph possessed the weapon. Accordingly, we have no hesitation in affirming Randolph's CPWOL conviction.

Given all of the evidence, including testimony that Randolph was with Stewart both at the scene of the kidnapping on October 19 and when he handed the revolver to Stewart on the following day, it may be—although we need not and do not decide the point—that if the government had argued in timely fashion that the error in admitting hearsay was harmless, that argument might have prevailed even against Randolph.[19] Nevertheless, applying the rigorous standard that courts have adopted for cases in which the government has failed to make a timely claim of harmlessness, we conclude that the error in Randolph's case was prejudicial, not harmless, and that Randolph's convictions (except of CPWOL) must be reversed.

### (4) *Stewart*

 The case against Stewart, on the other hand, was overwhelming, and in our

---

19. At least arguably, it is improbable, on this record, that if Stewart is guilty, Randolph is not guilty. The government might claim, not implausibly, that if evidence against Stewart was overwhelming, this "overwhelmingness" logically carries over to Randolph as well. Nevertheless, the evidence that Stewart admitted committing the crime, and the absence of similar evidence as to Randolph, warrants our excusing the government's waiver in Stewart's case but not in Randolph's.

view, his claim of reasonable doubt is implausible. Notwithstanding the government's waiver, reversal of Stewart's convictions is unwarranted.

Stewart argues that two of the principal witnesses against him—John Holmes and Kwatika Johnson—changed their stories repeatedly, and that their credibility was significantly impaired. His point is well taken, and if the testimony of Mr. Holmes and Kwatika stood alone, the case for the prosecution would arguably rest on a shaky foundation. But Stewart's forceful critique of the inconsistencies in the testimony of Holmes and Kwatika does not account for a powerful part of the case against him, namely, the testimony of Tracey Johnson, combined with the ballistic evidence.

However compromised Kwatika Johnson's veracity may have been, her most damaging testimony—that on October 22 Stewart pointed a revolver at her and at her unborn baby, and threatened to kill her while boasting that he had killed Carlos Thomas—was substantially corroborated by Tracey Johnson. Tracey related that Stewart (known to her as Tony) "said

he was going to put three bullets in [Kwatika] ... [be]cause he had already used the other three [on] Carlos." Questioned by the court regarding whether the foregoing was merely hearsay—*i.e.*, something that Kwatika had told her—Tracey emphasized no, that "*I heard him say it.*" On further interrogation by the judge, she reiterated: "Yes, I heard it from Tony." [20] Finally, when asked by Stewart's attorney whether words to the effect that "I used three on Carlos, now I'll use three on you" were what Kwatika said or what Tracey heard Tony say, Tracey responded: "That's what I heard [from the mouth of] Tony." Thus there was unrebutted testimony not only from Kwatika but also from Tracey, that Stewart had admitted (and bragged about) having killed Carlos Thomas.[21]

Tracey and her grandmother called the police, who promptly proceeded to Kwatika's mother's house. There, the officers apprehended Stewart, and Kwatika led them to the revolver with which Stewart had threatened her and which he had subsequently concealed. Ballistic evidence at

---

20. Stewart's attorney proffered that, on a subsequent videotape, Tracey claimed that the substance of Stewart's statement was "I had six bullets in my gun, I used three on Carlos, [and] I've got three left [that] I'm going to use on you." As we read the record, the efforts on behalf of Stewart to impeach or discredit Tracey's testimony regarding Stewart's admission were quite unsuccessful.

21. In her rebuttal argument, Ms. Jeffress, one of the prosecutors, effectively described to the jury the devastating force of Tracey Johnson's testimony:

> But the police questioned [Kwatika]. They knew because Tracey Johnson told them what Tracey Johnson heard. They knew that Phillip Stewart had said to Kwatika Johnson, I'm going to put three bullets in you like I did Carlos.
>
> Now, maybe what Tracey Johnson remembers him saying is, I've got three bul-

lets left; I'm going to put three in you because I've got three bullets left because I put three in Carlos. Tracey Johnson garbled it up a little bit, but do you think she's not telling you the same thing that Kwatika Johnson told you? It's the same statement: I'm going to put three bullets in you like I did Carlos. And Tracey Johnson got the message. Tracey Johnson called Detective Saunders, her friend, and said, have you guys got a homicide by the name of Carlos? This is what I heard.

> She knew what she heard. What she heard was him say, I put three bullets in Carlos. However you want to cut it, however you want to put the quotation marks. I'm going to kill you like I killed Carlos. It's the same statement. No matter which detective is writing it down, it's the same statement.

trial established that the recovered revolver was the weapon which had been used two days earlier to kill Carlos Thomas. Thus, Stewart's admission of murder was effectively corroborated by his possession, shortly before his arrest, of the weapon with which that murder had been committed. Perhaps Stewart's revealing admission, standing alone, would not have been enough to prove his guilt, and it may be that the ballistic evidence, though extremely incriminating, would not have been sufficient by itself to render the trial judge's error "obviously" harmless (even though each of these pieces of evidence was independently quite damning). But considering together Stewart's admission that he killed Thomas and his possession of the murder weapon two days later, the case against Stewart becomes compelling indeed. This evidence also had the effect of alleviating any otherwise plausible doubts about the truth of the incriminating testimony of John Holmes and Kwatika Johnson.[22] If, as Tracey and Kwatika testified, Stewart admitted that he shot Thomas, and if Stewart also had possession of the murder weapon so soon thereafter, then Holmes' testimony that he saw Stewart participate in the abduction becomes far more believable, in that it is consistent both with the admission and with the recovery of the revolver. Similarly, if Stewart made the admission of murder that Tracey overheard, then the credibility of Kwatika's testimony regarding Stewart's other incriminating statements is enhanced, for her description of these statements becomes consistent with other independently proved facts. In other words, the pieces of the puzzle fit together, and they all point, unerringly in our view, to Stewart's guilt.

Given the totality of the evidence, any hypothetical possibility that an impartial jury would have a reasonable doubt of Stewart's guilt is remote indeed. The erroneously admitted hearsay testimony may have tended to make Holmes' evidence for the prosecution marginally more believable (and his later testimony for the defense less credible). This is so because Ms. Sudler was permitted to testify that Holmes had described the abduction (albeit without identifying the perpetrators) soon after Thomas was forced into the car. The effect of this erroneous evidentiary ruling, however, was surely marginal when compared to Stewart's boast that he shot Carlos Thomas, coupled with his possession of the weapon with which the crime was committed. We should not lightly relieve the government of its improvident failure to argue, in timely fashion, that the erroneous admission of hearsay was harmless in the traditional sense. In this case, however, we *conclude that it is* appropriate to affirm Stewart's conviction notwithstanding that failure.

But, Stewart argues, "[g]iven the stringent waiver rules that are routinely applied to criminal defendants, excusing the government's waiver smacks of unfairness." This suggestion of a double standard would be more persuasive if the court were treating the waiver as if it made no difference—as if, in other words, it had not occurred. But as our reasoning in revers-

---

**22.** Kwatika also testified that, after she and Stewart were married, he urged her to tell a fabricated story to the effect that she had come into possession of the revolver in a bag of compact discs which a man had given her on Martin Luther King Avenue. She further stated that Stewart described Carlos's abduction to her, and that after the discovery of the decedent's body, Stewart remarked: "One down, one more to go." According to Kwatika, Stewart told her that he wanted revenge against Carlos because he believed that Carlos had previously set Stewart up to be shot. The veracity of Kwatika's account of Stewart's various incriminating statements is enhanced by Stewart's telling admission, overheard by Tracey, by Stewart's possession of the revolver, and by the ballistics evidence.

ing Randolph's conviction demonstrates, we have not viewed the government's failure to present its claim of harmlessness at the appropriate time as being irrelevant. On the contrary, as this opinion demonstrates, a waiver can involve major costs to the government—here, quite possibly, the reversal of Randolph's conviction. Such costs are surely sufficient to inhibit a competent prosecutor from keeping argument B in his or her hip pocket and using it only if argument A fails. We reiterate that it is only in the rare circumstance in which harmlessness is obvious that we are prepared to find an error harmless notwithstanding the government's failure to make a timely claim of harmlessness.[23] Moreover, no matter whose ox is gored, this court has frequently requested post-argument briefing of issues not adequately raised by counsel, to the end that, after both parties have been fully heard, the court is in the best position to render a sound decision.

Finally, we emphasize that there is no double standard, nor can one be tolerated. Post-argument orders by this court have permitted defense counsel to address issues not adequately raised in the initial submissions. In *Watkins v. United States*, 846 A.2d 293 (D.C.2004), for example, the defendant, in his opening brief, had limited his argument on one issue to a conclusory footnote. The government argued that because the defense had relegated the point to that footnote, the claim had been waived. As in the present case, the court ordered supplemental briefing, and the defense briefed more thoroughly the claim which it had previously addressed so sum-

marily. The government then reasserted its claim of waiver, arguing that the defendant's post-argument briefing came too late and that the issue should be deemed to have been waived as a result of its limited mention in the appellant's original brief. The court disagreed, however, holding that the point had now been fully briefed, that the government had not been prejudiced, and that the issue should be treated as having been preserved. *Id.* at 296.[24]

In *Outlaw v. United States*, 632 A.2d 408 (D.C.1993), *cert. denied*, 510 U.S. 1205, 114 S.Ct. 1326, 127 L.Ed.2d 674 (1994), a post-argument order of this court directing supplemental briefing resulted in the reversal of the defendant Noah Outlaw's conviction on a ground that had not previously been raised by him. In that case, we declined to reach the principal question briefed by counsel, namely, whether a defendant may be convicted as an accessory after the fact (AAF) to murder on the basis of actions taken while the decedent was still alive. Instead, after ordering supplemental post-argument submissions, we concluded that the evidence was insufficient to support the defendant's conviction as an AAF to any offense at all. *Id.* at 410–11. Our reversal of the defendant's conviction in *Outlaw*, and our affirmance of Stewart's conviction in this case, are both consistent with Supreme Court doctrine: "[A] court may consider an issue 'antecedent to ... and ultimately dispositive of' the dispute before it, even an issue the parties fail to identify and brief." *United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am.*, 508 U.S.

---

23. Stewart maintains that the prosecutors made a considered and deliberate decision to forgo a traditional claim of harmlessness. The government represents that the decision was inadvertent and improvident—"this is a case in which the government simply 'dropped the ball.'" We take counsel for the prosecution at their word, especially since we

are aware of no plausible tactical reason for the government's failure to argue from the outset that any error in admitting any hearsay was harmless.

24. The conviction was, however, affirmed on other grounds.

439, 447, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993), quoted in *Outlaw,* 632 A.2d at 410 n. 7. When a court does so, however, it should ensure procedural fairness, both to the government and to the defense, by providing each party with the opportunity to brief an issue viewed by the court as significant and potentially decisive.

In sum, we conclude that reversal of Stewart's convictions is warranted. In our view, his is one of the comparatively rare cases in which the judgment should be affirmed on harmlessness grounds, notwithstanding the government's initial failure to argue that the trial court's error was harmless.

### III.

### CONCLUSION

■ For the foregoing reasons, Randolph's convictions of first-degree murder while armed, kidnapping, and PFCV are reversed. His conviction of CPWOL is affirmed. Randolph's case is remanded to the trial court for further proceedings consistent with this opinion.[25] All of Stewart's convictions are affirmed.

*So ordered.*[26]

25. Although we reverse Randolph's principal convictions on other grounds, an issue that he raises on this appeal may arise again at a retrial. Over objection, Detective Erick Brown was permitted to testify that, during his investigation, unidentified witnesses informed him that Randolph was the person with Stewart (who had already been arrested) on the night that Carlos Thomas was killed:

> Q: So then based [upon] what Mr. Holmes told you on March 1, 2000, you continued to investigate the case in order to figure out who was the drive[r] of that car[,] is that right?
> A: Yes.
> Q: And you interviewed witnesses about who might have been with Phillip Stewart in that week in which Carlos Thomas was killed[,] right?
> A: Yes.
> Q: And through those interviews you found out about Ronald Randolph[,] is that right?
> A: Yes.
> DEFENSE COUNSEL: Objection.

Although this evidence was ostensibly elicited to explain the police investigation rather than to prove the truth of the matter asserted by the unidentified witnesses, the effect of Detective Brown's testimony was to bring to the attention of the jury material that was very damaging to Randolph. Randolph had no opportunity to confront or cross-examine the witnesses whom the police had evidently interrogated. We conclude that the admission of this evidence violated the Confrontation Clause, *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), as well as the hearsay rule; *cf. Battle v. United States,* 630 A.2d 211, 214–15 (D.C. 1993) (rejecting admission of statements inculpating defendant under an "origin of the investigation rationale"). It should not be admitted in the event that Randolph is tried again.

26. Stewart has also attached to one of his post-argument submissions correspondence from the United States Attorney's office revealing possible misconduct on the part of one of the police officers involved in this case. This information has not been presented to the trial court, and we will not consider it as a part of this appeal. Any remedy that Stewart may have must be sought in the first instance in the trial court.