*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 24-CF-0803

DAVEION A. ERVIN, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2023-CF2-003352)

(Hon. Jason Park, Trial Judge)

(Submitted October 1, 2025                    Decided January 22, 2026)

*Nigel A. Barrella* was on the brief for appellant.

*Edward R. Martin, Jr.*, United States Attorney at the time the brief was filed, and *Megan Abrameit*, *Chrisellen R. Kolb*, *Eric Hansford*, and *Samuel Ison*, Assistant United States Attorneys, were on the brief for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and BECKWITH and DEAHL, *Associate Judges*.

DEAHL, *Associate Judge*: Daveion Ervin was with his daughter and his partner at a playground in a public park when several police officers approached him. The first two officers approached him in a casual manner and explained to Ervin that they wanted to speak with him because he had walked away from a group of individuals

that other officers had approached in another part of the park. Ervin explained that he was "there with [his] kid" and had gone to "holler at" some of the individuals in the group but then returned to his daughter and partner "because there was a lot of police coming" and he did not want to be involved with that. In the meantime, three more officers approached Ervin from different directions, with the now-five officers effectively encircling him. One of the officers then asked Ervin if he had a firearm, and he admitted that he did. The officers recovered a firearm from Ervin's waistband and arrested him. Ervin moved to suppress the firearm as the fruit of an unlawful seizure. The trial court denied that motion and Ervin was convicted of several firearms-related offenses.

Ervin now appeals his convictions, challenging the trial court's denial of his motion to suppress. He argues, among other things, that he was seized without reasonable articulable suspicion when the group of five armed and uniformed police officers encircled him specifically and that the recovered firearm was a fruit of that unlawful seizure. We agree with Ervin and reverse each of his convictions.

## I. Background

At around 6:30 p.m. one May evening, while it was still bright out, several police officers on routine patrol noticed a group of about a dozen Black men in a public park near the Marvin Gaye Recreation Center. The armed and uniformed

officers were not responding to any report of criminal activity in the area, but they believed some of the men were smoking marijuana. Appellant Daveion Ervin broke off from the group as officers first approached it, and he walked about fifty yards over to where his daughter was playing at a playground on the other side of the park. One of the officers pointed at Ervin as he was walking away and radioed Investigator Robert Marsh, who had remained outside the park, to go "make contact with" Ervin.

Marsh and Lieutenant Kenyon Hogans approached Ervin on the playground, and their interaction with him was captured on multiple officers' body worn cameras. Ervin was facing the play structure where his daughter was playing and where his partner was sitting. Marsh and Hogans both casually walked up to Ervin from his left side as Hogans asked, "how you doing, sir?" Ervin responded, "what's up," and Hogans continued, "we just came to check you out, man." Ervin immediately lifted his arms as if preparing to be searched, and Hogans responded, "hold on, no," or something to that effect.[1] Ervin lowered his hands and said, "I'm chilling. I'm right here with my kid, man. I'm chilling." Hogans then said, "the only reason we came, we pulled up, is back there you started looking all crazy," pointing toward the group Ervin had walked away from. Ervin responded that he

---

[1] The exact exchange is hard to hear, but the trial court found that Hogans said, "No, wait. Hey, hey. Look," and interpreted that to mean "Hey, I'm not asking you to raise your hands. That's not what I was asking for."

had "just stepped out because there was a lot of police coming here" and "just went over there to holler" at the group before returning to the playground. Ervin's arms were outstretched along his sides with his palms facing down.

As that conversation took place over the course of about fifteen seconds, Marsh walked to the other side of Ervin so that he and Hogans stood on opposite sides of him, while three other officers came from two different directions to effectively encircle Ervin. Marsh and Hogans were within arm's reach of Ervin while the other three officers stood about five to ten feet away from him. Ervin's partner was at his 12 o'clock, on the play structure, while the five officers stood approximately at Ervin's 2, 3, 6, 9, and 11 o'clock. The officer's precise positioning is depicted in the still frame below, which is an image taken from the body-worn camera of Officer Allorie Kelemen, the late-arriving officer at Ervin's 2 o'clock. Ervin is the man standing in the circle of officers with his arms extended out to his sides, while his partner is the woman sitting at the foot of the play structure.



With the officers so positioned, and about one second after what is depicted above, Officer Marsh (in the forefront of the still image above, at Ervin's 3 o'clock) asked Ervin: "You don't have a firearm on you?"  Ervin responded: "yeah I have a firearm."  Officers then grabbed Ervin's arms and conducted a frisk, during which they recovered a firearm from his waistband.  Ervin was charged with (1) unlawful possession of a firearm; (2) carrying a pistol without a license; and (3) possession of an unregistered firearm.

Ervin moved to suppress the firearm as the fruit of an unlawful seizure.  After a hearing where the above facts were established, the trial court found that Ervin was not seized until after he admitted to having a firearm, when the officers grabbed his arms.  The trial court acknowledged that five armed and uniformed police officers

stood on "all different sides" of Ervin, with Marsh and Hogans "close enough to potentially touch him" before Ervin admitted that he had a firearm. But in the trial court's view, the "mere fact that [Ervin] was surrounded by officers" did not constitute a seizure given the officers' "cordial" tone when questioning Ervin, their casual approach "one at a time," the brevity of the encounter, and the fact that it took place in a public park during the day with others around.

The case proceeded to trial and a jury convicted Ervin on all three counts. Ervin now appeals.

## II. Analysis

Ervin argues that (1) officers unlawfully seized him before he admitted that he had a firearm; (2) even after his admission, officers did not have reasonable articulable suspicion to frisk him, or probable cause to arrest him, because they had no particular reason to believe that Ervin was not in lawful possession of his firearm; and (3) the District's laws regulating the registration and licensure of firearms are unconstitutional in light of the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). Because we agree with him on his first point, which requires vacatur of his convictions and would seemingly preclude any further prosecution, we do not resolve his other challenges.

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. Although we have recognized the "inherent pressure" many people feel to cooperate with police officers, not all citizen-police encounters are seizures, and "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *T.W. v. United States*, 292 A.3d 790, 795 (D.C. 2023) (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). The "crucial test" for determining whether a person has been seized is "whether, under the totality of the circumstances, 'police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.'" *Maye v. United States*, 314 A.3d 1244, 1253 (D.C. 2024) (quoting *Bostick*, 501 U.S. at 439). We review the questions of if and when a person was seized de novo, deferring to the trial court's factual findings unless clearly erroneous. *Dozier v. United States*, 220 A.3d 933, 940 (D.C. 2019).

The Supreme Court has recognized several circumstances that may indicate a person has been seized, including the "presence of several officers, the display of a weapon by an officer, some physical touching of the [person], or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *T.W.*, 292 A.3d at 795 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). We have added a variety of other factors to consider, which include, but are not limited to, whether (1) officers "focused exclusively on" the

person; (2) the location of the encounter was "secluded or out of public sight"; (3) the officers were uniformed or had weapons visible; (4) the officers blocked the person's potential exit paths; (5) the officers' questions were accusatory; and (6) the officers repeated their questions in the face of an initial denial. *See id.* (citing *Jones v. United States*, 154 A.3d 591, 595-96 (D.C. 2017), and *Golden v. United States*, 248 A.3d 925, 935, 938-39 (D.C. 2021)). There is no number of boxes a defendant needs to check to establish that he was seized, and on the flipside, there is no number of boxes officers can avoid checking to ensure they have not seized somebody. *See Hooks v. United States*, 208 A.3d 741, 746 n.12 (D.C. 2019). We instead take a "realistic" and "earthy" approach when evaluating whether a reasonable person in the defendant's shoes would have felt at liberty to terminate the encounter with officers and go about their day. *See id.* at 747; *Jones*, 154 A.3d at 595.

Here, the facts highlighted by Ervin in support of finding a seizure are that (1) five officers approached him; (2) all of them were focused exclusively on him; (3) they encircled him, leaving him no obvious exit paths, *see T.W.*, 292 A.3d at 799 (noting the relevant question as "whether [the defendant] would have reasonably understood the officers to be blocking his exits," not whether they had perfectly done so); and (4) their inquiries evinced that they suspected Ervin of wrongdoing, both by indicating that they were there to "check [him] out" because he had peeled off from a group and by asking if he had a firearm. While several additional factors

marginally counsel in favor of finding a seizure—for instance, Ervin is a Black man[2] and the officers were armed and in uniform—we agree with Ervin that the four factors enumerated above are by far the strongest support for his argument that he was seized before he admitted to having a firearm. On those facts alone, it is hard to imagine many people would feel free to terminate an encounter when they are encircled by several police officers who have shown an interest in investigating what they in particular are up to, just as it is hard to imagine that Ervin was in fact free to terminate this encounter with officers had he attempted to walk away without answering their questions.

The government counters by stressing several factors that it argues compel the contrary conclusion, that Ervin was not seized until after he admitted to having a firearm and officers restrained him. Namely, it emphasizes that (1) Ervin was in a public park with other people around while it was light out, *see Dozier*, 220 A.3d at 941 (noting the defendant was "alone, at night, [and] in a secluded alley" in finding he was seized); (2) the officers' questioning was quite brief, lasting only about

---

[2] Our precedents weigh Ervin's race in favor of finding that he was seized, given our observation that Black men "feel 'especially apprehensive' around the police such that conduct that may not rise to the level of a seizure without consideration of race, may do so once the defendant's race and lived experiences are accounted for." *See Carter v. United States*, 341 A.3d 1067, 1077 (D.C. 2025) (quoting *Dozier*, 220 A.3d at 944). We do not attach any significance to Ervin's race here, given our conclusion that Ervin was seized even setting that factor aside.

fifteen seconds before the critical moment when Ervin admitted that he had a firearm, *see T.W.*, 292 A.3d at 803 (noting that "brevity" counsels against finding a seizure unless the encounter is "so abrupt and fast-moving that it would have been disorienting to any reasonable person"); (3) the officers casually walked up to Ervin, rather than jumping out at him in what we have described as a "flashbang" approach that would counsel in favor of a seizure, *see id.*; and (4) the officers' questioning was cordial in tone and in content, particularly in light of Hogans's early assurance that officers were not there to search Ervin after he initially seemed to assume otherwise, *see supra* note 1. We agree with the government that each of these factors is some counterweight against concluding that Ervin was seized: the officers were indeed casual in their approach, cordial in their tone, and the encounter was brief and in a populated, well-lit area.

In our view, those factors are of relatively little weight when pitted against the fact that five officers had surrounded Ervin from all sides and exclusively targeted him for investigation through accusatory questioning, even if only briefly. *See T.W.*, 292 A.3d at 803 ("[A] polite and conversational tone does little to dispel coercion that arises from the content of officers' inquiries, or in how they have approached the suspect."). When a person is encircled by five police officers who are focused exclusively on them, the virtually inevitable result is they would not reasonably

believe they are free to terminate that encounter, so that they have been seized.[3] *See* Wayne R. LaFave, 4 Search & Seizure § 9.4(a) & n.104 (6th ed. 2025) (explaining that "encircling the suspect by many officers" tends to effect a seizure, and collecting cases); *Baude v. Leyshock*, 23 F.4th 1065, 1071 (8th Cir. 2022) ("When a person is surrounded by officers on all sides, he would reasonably believe that he is no longer free to leave and that he has been seized." (citing *Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989)))).[4]

---

[3] We can imagine some unusual scenarios where that would not be the case, and we do not pronounce any hard-and-fast rule here. For instance, if officers explicitly tell a suspect they are free to terminate the encounter at will, that would go an awfully long way toward dispelling any coercion inherent in their numbers and positioning.

[4] *See also United States v. Delaney*, 955 F.3d 1077, 1082-83 (D.C. Cir. 2020) (seizure when two officers parked their car three feet from defendant's car at night and shined a "take-down" light at it, with the parking distance being the "most important[]" factor); *United States v. Burton*, 441 F.3d 509, 510, 512 (7th Cir. 2006) (seizure when three officers on bicycles approached defendant's car from the front and on either side); *State v. Pham*, 497 P.3d 217, 223 (Mont. 2021) (seizure when two officers approached defendant's car on either side and asked during a "cordial" conversation if he had guns, knives, drugs, or child pornography inside); *State v. Weldon*, 445 P.3d 103, 113 (Haw. 2019) (seizure when "at least two officers, and likely three, had surrounded" a suspect and asked for identification); *Flonnory v. State*, 805 A.2d 854, 857-58 (Del. 2001) (seizure when three officers approached defendant's car and "took up positions on three sides"); *People v. Cantor*, 324 N.E.2d 872, 876 (N.Y. 1975) (seizure when defendant was "encircled by three police officers as he stood alongside his car," with his exit blocked); *State v. Hintze*, 571 P.3d 1216, 1226 (Utah Ct. App. 2025) (seizure when two citizens were approached by three armed, uniformed officers who "almost immediately positioned themselves and their bikes" between defendant and his only exit path and posed "accusatory questions"); *People v. Armstrong*, 1 N.W.3d 299, 303-04 (Mich. Ct. App. 2022)

The government suggests that this court's opinion in *Golden* is to the contrary. In that case, four police officers in two unmarked vehicles converged on an individual, Brandon Golden, and positioned their cars ten to twenty feet from him in a perpendicular L shape—roughly forming two sides of a box around him. *Golden*, 248 A.3d at 931. While all four of the officers remained in their vehicles with their windows down, one of them asked Golden if he had any weapons on him, and Golden responded in the negative. *Id.* at 932. The officer followed up, asking Golden if he could "just show me your waistband," and Golden complied. *Id.* At that point we held that Golden had been seized in light of the officers' positioning and their accusatory questioning. *Id.* at 938 (noting that "the encounter attained the level of a Fourth Amendment seizure when the police officer called upon the suspect to expose his waistband" and Golden "acquiesced").

The government stresses that, in *Golden*, we held that Golden had *not* been seized when officers initially asked Golden if he had any weapons on him, after they had partially boxed him in with their vehicles. It was only when officers persisted in their accusatory questioning, by asking Golden to show his waistband to prove he did not have a weapon on him, that we opined that "the encounter became a seizure."

---

(seizure when defendant's car was "surrounded on all sides" by five officers and one police vehicle).

*Id.* at 936. And because here the officers did not persist in questioning Ervin after any initial denial of wrongdoing—Ervin admitted to having a firearm the first time he was asked—the government reads *Golden* as supporting the conclusion that Ervin was not seized at the point of that initial inquiry about a firearm.

We see it differently. As a preliminary matter, we have our doubts about whether the government has an accurate understanding of what we held in *Golden*.[5] But putting those doubts aside, even if we read *Golden* as the government does, that would not change our conclusion that Ervin was seized here. Unlike in *Golden*, the officers here had completely encircled Ervin at close range before asking if he had a firearm. To be sure, in this case the officers did not persist with accusatory questioning in the face of an initial denial of wrongdoing, so that is one significant factor favoring a seizure that was present in *T.W.*, 292 A.3d at 797-98, and *Golden*,

---

[5] *Golden* said that the officer's initial inquiry "*[b]y itself*" did not amount to a seizure, 248 A.3d at 937 (emphasis added), but we did not analyze whether or not the totality of circumstances up to and concluding at that question amounted to a seizure, no doubt because the relevant question in that appeal was whether Golden had been seized at a later point in time. *See Murphy v. McCloud*, 650 A.2d 202, 205 (D.C. 1994) ("The rule of stare decisis is never properly invoked unless in the decision put forward as precedent the judicial mind has been applied to and passed upon the precise question." (quoting *Fletcher v. Scott*, 277 N.W. 270, 272 (Minn. 1938))). There is some language in *Golden* to the effect that Golden had not been seized until the officers' follow up question asking him to "expose his waistband"— we described that moment as when "the encounter became a seizure" and went "beyond mere questioning." *Id.* at 936-37. But whether those statements were holdings or mere dicta is a question we will save for another day.

248 A.3d at 937-38, but is absent here. Still, neither *T.W.* nor *Golden* suggested that persistent questioning in the face of a denial is a necessary condition to find that someone is seized—that would be an indefensible view that we do not understand the government to press. *See, e.g.*, *supra* note 4 and accompanying text; *Brower*, 489 U.S. at 599 (concluding that police seized a suspect by erecting a roadblock, without asking him any questions).

What this case lacks in persistent accusatory questioning it more than makes up for in the coercive positioning of the police officers. The officers here were not sitting in their vehicles ten to twenty feet from Ervin, talking to him through car windows while only partially blocking his path, as they were in *Golden*. They had instead exited their vehicles, positioned themselves on all sides of Ervin, with two officers standing within arm's reach while the others stood no more than a couple of steps away.

Consider it this way: if five random civilians had converged on Ervin and encircled him in just the same manner as the officers had, a reasonable person in his shoes would surely think he was in for a scrap, or at least that he could not walk away without explaining himself or talking his way out of something. *See* LaFave, *supra*, at § 9.4(a) ("[A]n encounter becomes a seizure if the officer engages in conduct a reasonable person would view as threatening or offensive even if

performed by another private citizen."). The positioning alone communicates, loudly and clearly, "you're not going anywhere." And it would feel even more coercive when those five individuals encircling the person are not random civilians, but armed and uniformed police officers asking accusatory questions. *See Jones*, 154 A.3d at 595-96 (noting that "an encounter in which a visibly armed police officer in full uniform" interrupts a person "going about his private business" is "not an encounter between equals" because officers initiate encounters with an "undeniable air of authority"). A reasonable person in Ervin's position would not have felt free to go about his business when five armed police officers encircled him in a manner that blocked his exits, focused exclusively on him, and indicated he was being targeted for investigation.

Ervin was therefore seized before he admitted to having a firearm. The government does not argue that the officers had reasonable articulable suspicion to effect that seizure, so his seizure was unlawful and the firearm they recovered from him was a fruit of that illegality that should have been suppressed. The government also does not argue that the trial court's failure to suppress the firearm was harmless error as to any of Ervin's convictions, nor could it plausibly do so given the centrality of the recovered firearm to Ervin's prosecution for firearm offenses. *See Randolph v. United States*, 882 A.2d 210, 223 (D.C. 2005) (holding that in the absence of any argument by the government that an error was harmless, we affirm the appellant's

convictions "only when harmlessness is obvious"). So we reverse all of Ervin's convictions.

### III. Conclusion

For those reasons, we conclude that Ervin was seized in violation of the Fourth Amendment and that the firearm was a fruit of that unlawful seizure that should have been suppressed. We reverse Ervin's convictions and remand the case for further proceedings consistent with this opinion. In light of our disposition, we do not address Ervin's additional arguments that officers did not have adequate grounds to stop and search him even after he admitted to having a firearm on him, and we likewise do not address his Second Amendment challenges to the District's firearm registration and licensure statutes.

*So ordered.*