Noah C. OUTLAW, Appellant,

v.

UNITED STATES, Appellee.

Samuel H. OUTLAW, Appellant,

v.

UNITED STATES, Appellee.

Nos. 91–CF–959, 92–CF–109.

District of Columbia Court of Appeals.

Argued June 16, 1993.

Decided Oct. 21, 1993.

Robert L. Chaves, Washington, DC, for appellant Noah C. Outlaw.

Dennis M. Hart, Washington, DC, for appellant Samuel H. Outlaw.

Barbara K. Bracher, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty. at the time the brief was filed, and John R. Fisher and Roy W. McLeese III, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before FERREN, SCHWELB, and FARRELL, Associate Judges.

SCHWELB, Associate Judge:

Samuel Outlaw was convicted by a jury of second-degree murder while armed, D.C.Code §§ 22–2403, –3202 (1989), possession of a firearm during a crime of violence (PFCV), § 22–3204(b), and carrying a pistol without a license (CPWOL), § 22–3204(a). At the same trial, Noah Outlaw, Samuel's older brother, was convicted of being an accessory after the fact (AAF) to second-de-

gree murder while armed, D.C.Code § 22–106, and of CPWOL. The two brothers' prosecutions followed the fatal shooting of Walter Jones on a parking lot basketball court in southeast Washington, D.C. on March 3, 1990. Samuel Outlaw was then sixteen years old, and looked much younger; Noah Outlaw was eighteen.

■ On appeal, Samuel Outlaw challenges several evidentiary rulings by the trial judge and claims that he was denied a fair trial as a result of improper prosecutorial argument. We are not persuaded by any of his contentions, and we affirm his convictions without plenary discussion.[1] We also summarily reject Noah Outlaw's claim that the

evidence was insufficient to support his CPWOL conviction.[2] We reverse Noah Outlaw's AAF conviction upon the ground that the evidence was insufficient to prove that he was an accessory after the fact to murder or to any lesser included offense.

## I.

### THE EVIDENCE [3]

The prosecution presented evidence tending to show that at approximately 11:00 a.m. on the day of the murder, Samuel Outlaw was arguing with Walter Jones over a $20 debt which Samuel claimed that Jones owed him. Jones said he did not have any money.

---

**1.** Samuel Outlaw claims that the prosecutor, in presenting his opening statement, made an improper argument instead of previewing the evidence. The prosecutor did so, according to Samuel Outlaw, by informing the jury of the elements of the charged offenses and by then connecting the evidence to those elements. In our view, the trial judge acted well within his discretion, see *Wright v. United States*, 508 A.2d 915, 919 (D.C.1986), in holding that the opening statement was proper. The prosecutor did not do more than inform the jury "of the nature of the action and defense so that they may be better prepared to understand the evidence." *Best v. District of Columbia*, 291 U.S. 411, 415, 54 S.Ct. 487, 489, 78 L.Ed. 882 (1934); *see also Jackson v. United States*, 515 A.2d 1133, 1134 (D.C.1986).

Samuel Outlaw next contends that, during closing argument, the prosecutor argued facts not in evidence, especially in relation to certain expert medical testimony. Although that testimony was somewhat unclear, we are satisfied (as was the trial judge, who was "on the scene" while the expert testified) that the prosecutor permissibly drew reasonable inferences from the evidence. *See Dixon v. United States*, 565 A.2d 72, 80 (D.C.1989). Moreover, the trial judge instructed the jurors that their recollection of the evidence was controlling. *See Irick v. United States*, 565 A.2d 26, 38 (D.C.1989).

The prosecution introduced testimony tending to show that witnesses to the shooting of the decedent did not wish to be interviewed by the police on the scene, evidently out of fear of reprisal, and that their statements were in fact taken in other locations. We are inclined to agree with Samuel Outlaw that this evidence was irrelevant to any legitimate issue; we are not especially impressed with the government's claim that "the eyewitnesses' fear of being discovered talking to the police after witnessing a murder ... bolster[ed] their credibility and show[ed] their state of mind when they provided the descriptions of the defendants." This reaction on the part of witnesses who had just observed a cold-blooded murder on the street, how-

ever, was hardly surprising; the instinct for self-preservation is well-nigh universal. Given the uncontradicted evidence of at least three witnesses that Samuel Outlaw fatally shot the decedent, we are satisfied that any error was harmless. *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).

Over the objection of counsel for Samuel Outlaw, the trial judge admitted rebuttal testimony which contradicted evidence presented solely in Noah Outlaw's defense. Samuel Outlaw had presented no evidence on the subject. The judge specifically ruled that rebuttal testimony would be admitted solely to the extent that it legitimately contradicted Noah Outlaw's defense case. We conclude that the admission of this evidence was not error. *Battle v. United States*, 515 A.2d 1120, 1126 (D.C.1986). Moreover, as to Samuel Outlaw, the evidence of the rebuttal witness was largely cumulative.

**2.** As set forth in greater detail in the text, *infra*, the prosecution presented testimony which, if credited, as it must be for purposes of a claim of evidentiary insufficiency, *Irick, supra* note 1, 565 A.2d at 30, established that after Samuel Outlaw shot Walter Jones, Noah Outlaw took a pistol from his brother, placed it in his pants pocket, and approached Jones in a manner which witnesses perceived to be threatening. Subsequently, he returned the pistol to Samuel. This evidence satisfied all of the elements of CPWOL. *Deneal v. United States*, 551 A.2d 1312, 1316–17 (D.C.1988) (citing CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.81(A) (3d ed. 1973)). There was no suggestion that Noah Outlaw took possession of the pistol in order to defend a third party from harm, or for any other legitimate purpose. *Cf. Logan v. United States*, 402 A.2d 822, 825–26 (D.C.1979).

**3.** We confine our narrative of the evidence to those facts relevant to Noah Outlaw's conviction as an accessory after the fact.

Samuel Outlaw left and went into a nearby apartment building. He soon emerged with a small silver-colored pistol in his hand. Samuel Outlaw complained to Jones that "you ain't going to pay me my fucking money, man," and fired the handgun into Jones' neck. Jones grabbed his throat and began gasping for air. Jones' half-brother, Anthony Ferguson, held Jones and attempted to assist him.

At some point during this tragic encounter, but apparently after Samuel Outlaw fired the shot, Noah Outlaw arrived on the scene. Jones was still alive. Samuel Outlaw handed Noah Outlaw the pistol. Noah Outlaw profanely reprimanded his brother because the latter had not killed Jones.[4] He then placed the pistol in his pocket and began to walk towards Jones in a manner that at least two witnesses perceived as threatening.[5] Several individuals immediately interceded, and Noah "chilled" and backed off, apparently because police officers were arriving on the scene. Noah Outlaw returned the handgun to Samuel, who left the area. One witness testified that Noah had previously stated that his brother was to "[g]o to aunt somebody's house." Noah Outlaw remained on the scene and watched the police officers as they investigated the shooting. One of the witnesses pointed Noah Outlaw out to the officers, and Noah was arrested.

Noah Outlaw testified that he and his sister's friend, Diane McBride, were visiting a neighbor's apartment when Noah heard a shot. He and Ms. McBride came outside and saw Walter Jones collapse on the basketball court. Noah denied that he took a handgun from his brother, or that he had been in possession of a gun at all on that day. He further denied having seen his brother on the scene, or having approached Walter Jones in a threatening manner or otherwise. Ms. McBride substantially corroborated Noah Outlaw's testimony.[6] Obviously, however, the jury did not believe the defense version of events.

## II.

## THE ACCESSORY AFTER THE FACT CONVICTION

At the conclusion of the prosecution's case, Noah Outlaw's trial attorney moved for a judgment of acquittal with respect to the AAF count upon a single ground, namely, that all of Noah's Outlaw's alleged unlawful conduct occurred while the decedent was still alive, and that Noah therefore could not be an accessory after the fact to murder. No other insufficiency claim has been made on Noah Outlaw's behalf, either in the trial court or in his appellate counsel's brief on appeal. At oral argument, however, members of the court raised, on their own initiative, the question whether the evidence was sufficient to support Noah Outlaw's conviction of AAF to any offense whatever. After argument, the court entered an order inviting the parties to file supplemental memoranda addressing this issue. We now conclude that the evidence was insufficient to support a conviction of accessory after the fact to murder or to any lesser included offense.[7] We do not reach the principal question briefed by the parties, namely, whether one may be convicted of being an accessory after the fact to murder on the

---

**4.** Debra Holmes Battle quoted Noah Outlaw as saying "you stupid mother-fucker, you should've killed him." Calvin Perry testified that Noah Outlaw told his brother that "you fucked up, you should have killed the mother-fucker."

**5.** According to Ms. Holmes Battle, Noah Outlaw "acted like he was going to go up and shoot him again." Ms. Holmes Battle testified, however, that she did not know what Noah did with the gun. LaRonda Adams also testified that she thought Noah Outlaw was going to shoot Walter Jones; someone had yelled "don't shoot him again," or words to that effect.

**6.** Ms. McBride, a woman in her mid-thirties (almost twice Noah Outlaw's age), was not on close terms with Noah. In fact, she testified that, at some time after the shooting, she moved away from her residence because Noah Outlaw struck her in the face in the course of a dispute over money.

**7.** "[A] court may consider an issue antecedent to ... and ultimately dispositive of the dispute before it, even an issue the parties fail to identify and brief." *United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am.*, — U.S. —, —, 113 S.Ct. 2173, 2178, 124 L.Ed.2d 402 (1993) (internal quotations and citations omitted).

basis of actions taken while the decedent was still alive.[8]

The District's AAF statute provides in pertinent part as follows:

> Whoever shall be convicted of being accessory after the fact to any crime punishable by imprisonment shall be punished by a fine or imprisonment, or both, as the case may be, not more than one-half the maximum fine or imprisonment, or both, to which the principal offender may be subjected.

D.C.Code § 22–106 (1989).[9] In the absence of a statutory definition of the elements of the crime, we look to the common law. *Clark v. United States*, 418 A.2d 1059, 1061 (D.C.1980); *see also Butler v. United States*, 481 A.2d 431, 442–43 (D.C.1984), *cert. denied*, 470 U.S. 1029, 105 S.Ct. 1398, 84 L.Ed.2d 786 (1985). We explained in *Clark* that

> [u]nder the common law, [a]n accessory after the fact is one who, knowing a felony to have been committed by another, receives, relieves, comforts, or assists the felon in order to hinder the felon's apprehension, trial, or punishment. *Skelly v. United States*, 76 F.2d 483, 487 (10th Cir. 1935) (citing, among others, JONES' BLACKSTONE, Books 3 and 4, at 2204).

418 A.2d at 1061 (internal quotations omitted).

In *Howell v. State*, 62 Md.App. 278, 489 A.2d 55 (1983), the court defined the elements of accessory after the fact as follows:

> (1) A completed felony must have been completed by another prior to the accessoryship;

> (2) The accessory must not be a principal in the commission of the felony;

> (3) The accessory must have knowledge of the felony; and

> (4) The accessory must act personally to aid or assist the felon to avoid detection or apprehension for the crime or crimes.

*Id.* 489 A.2d at 58 (citations omitted).

What kind of conduct aids a principal to avoid detection or apprehension? There can, of course, be no exhaustive or all-embracing answer. Observing in 1765 that "any assistance whatever given to a felon to hinder his being apprehended, tried, or suffering punishment" is sufficient, Blackstone provided the following illustrations:

> furnishing him with a horse to escape his pursuers, money or victuals to support him, a house or other shelter to conceal him, or open force and violence to rescue or protect him. So likewise to convey instruments to a felon to enable him to break gaol, or to bribe the gaoler to let him escape, make a man an accessory to the felony.

IV W. BLACKSTONE, *supra*, at 37–38, quoted in *Government of Virgin Islands v. Aquino*, 378 F.2d 540, 553 n. 21 (3d Cir.1967). More than two centuries later, Blackstone's successor commentators have expanded his enumeration:

> Illustrative of the acts which qualify, assuming the presence of the other requirements, are harboring and concealing the felon, aiding the felon in making his escape, concealing, destroying or altering evidence, inducing a witness to absent him-

---

**8.** In that connection, *compare State v. Williams*, 229 N.C. 348, 49 S.E.2d 617, 618 (1948) *with United States v. McCoy*, 721 F.2d 473, 474–75 (4th Cir.1983), *cert. denied*, 466 U.S. 940, 104 S.Ct. 1918, 80 L.Ed.2d 465 (1984). Although we need not and do not take any position on the issue, we do note as a matter of historical fact, not focused upon by counsel, that the District's statute has remained unchanged at least since the beginning of the century, *see* 31 Stat. 1337, ch. 854, § 909 (1901), and that it has been construed as consistent with the common law. *See* text, *infra*, at 7 (citing cases). As the government has acknowledged in its well-researched and scholarly brief,

> the early common-law commentators almost invariably take the view that a defendant may

not be convicted as an accessory after the fact to murder unless the victim was dead at the time the defendant committed the acts of assistance. *See, e.g.*, I HALE, PLEAS OF THE CROWN 621 (1st Amer. ed. 1847); 4 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 38 (Chitty ed. 1826); II W. HAWKINS, PLEAS OF THE CROWN 448 (Curwood ed. 1824).

**9.** In some jurisdictions, AAF statutes exempt close relatives, including siblings. *See* WAYNE R. LAFAVE & AUSTIN W. SCOTT, SUBSTANTIVE CRIMINAL LAW, § 6.9, at 169 & nn. 31 & 32 (1986); *State v. Williams*, 142 Vt. 81, 82, 451 A.2d 1142, 1143 (1982). Section 22–106 contains no such exemption.

self or to remain silent, giving false testimony at an official inquiry into the crime, and giving false information to the police in order to divert suspicion away from the felon.

LaFave and Scott, *supra* note 9, § 6.9 at 167–68 (citations omitted). The question is whether Noah Outlaw rendered any such assistance to his brother in the present case.

■ The conduct which, according to the government, constituted accessoryship after the fact on Noah Outlaw's part can be roughly divided into two categories. The first consisted of Noah's alleged acts of intimidation of Walter Jones and perhaps of others; the government apparently contends, although it has not clearly so stated, that these acts were designed to silence potential witnesses, and thus to protect Samuel Outlaw from prosecution and punishment. The second category involved alleged assistance to Samuel Outlaw in making his escape and in disposing of the murder weapon.

In connection with the alleged intimidation, the government cites Noah Outlaw's reprimand of Samuel for not having killed Jones with the first shot, his advance upon Jones with a pistol, and his continued presence on the scene during the police investigation. The reprimand was undoubtedly a morally repugnant act, but it is difficult to connect it directly to the actual or potential silencing of a witness. The advance toward Walter

Jones was perceived by some of the persons present as threatening, but it lasted only a few seconds, and Noah never actually did any harm to Jones. Moreover, Noah Outlaw apparently had the weapon in his pocket.[10] We do not think that these actions, individually or in combination, could establish beyond a reasonable doubt that Noah became an accessory after the fact (either to the murder or to the assault which preceded it) by silencing or attempting to silence potential witnesses.

■ The government also claims that Noah Outlaw assisted Samuel Outlaw in making his escape by directing him to go to a specified place of refuge and, moments later, by handing him the murder weapon (which was never recovered by the police). We do not doubt that one may become an accessory after the fact by counselling the principal how to get away. In the present case, however, the oral order issued by Noah Outlaw to his younger brother—if it was an order [11]—consisted of sending him to the house of their aunt. There is no indication that Samuel Outlaw was unaware of the existence of this potential refuge before Noah Outlaw told him to use it. Noah did not transport his brother to the aunt's home, or conceal him there, or engage in the kind of sheltering of a principal which one would ordinarily associate with accessoryship after the fact.[12]

---

10. The government's claim that Noah Outlaw intimidated potential witnesses, even after Jones was dead, simply by remaining on the scene, is altogether unpersuasive. There is no evidence that Noah did anything at all after his brother's departure except watch events unfold. If he had fled, his flight would doubtless have been characterized as reflecting consciousness of guilt.

The government points out that some witnesses were afraid to give statements to the police on the scene. Common sense surely tells us that such fear was more probably the result of Samuel Outlaw's conduct in shooting a man than of Noah's observation of the investigation.

11. On its face, Noah's statement about the aunt's house could be interpreted as a command, a suggestion, or a casual remark. Arguably, if all reasonable inferences are drawn in favor of the prosecution, *see Clark, supra,* 418 A.2d at 1060, we should view that statement as a command by an adult older brother, who had taken over the scene, to his teenaged younger brother, to go to the designated location. Still, Noah was only two years older than his brother, a sixteen-year-

old gunman, and one might just as readily characterize the inference that Noah commanded Samuel as a speculative one.

12. In support of its argument that Noah Outlaw acted as an accessory after the fact by directing Samuel to an aunt's house, the government cites *McLain v. State*, 10 Md.App. 106, 268 A.2d 572 (1970), claiming that, as in *McLain*, Noah Outlaw "gave advice to the [felon] to guide him in avoiding police detection." *Id.* 268 A.2d at 577. A comparison of the two cases is instructive. In *McLain*, four armed robbers communicated with the appellant before committing the crime. They then robbed the victim of $279.00 and shot him in the head. They next reassembled at the appellant's house, left several weapons with him, and gave him a part of the proceeds of the robbery. The appellant then

> ... told us all to stay in the house after twelve o'clock. He left. When he left he took the two guns and left with Dennis Wilson. Told him to stay there.

It is true that after Noah Outlaw returned the pistol to Samuel Outlaw, the latter left the scene with it. An inference may arguably be drawn that the effect of Noah's having done so, together with his direction to Samuel to go to a specified potential refuge, was to help Samuel to get away and to rid himself of the murder weapon. Our focus, however, must be on whether Noah Outlaw *intended* "to aid or assist the felon to avoid detection or apprehension," *Howell, supra,* not on the effect of his actions. Noah returned the pistol to the person from whom he had received it. The police having arrived on the scene, passing the murder weapon to his brother can just as plausibly be viewed as an attempt on Noah's part to avoid being apprehended while in possession of incriminating evidence, and thus *to save his own skin,* rather than Samuel's.

We conclude that the government has failed to establish beyond a reasonable doubt that Noah Outlaw's remark about the aunt's house, and his return of the pistol, constituted accessoryship after the fact, either in isolation or in combination with Noah's allegedly intimidating conduct. Any inference of guilt based on such conduct is, in our view, altogether too speculative. We decline to construe the AAF statute expansively as reaching conduct which falls so far short of the illustrations of accessoryship provided by Blackstone more than two centuries ago and LaFave and Scott in more recent times.

Because the defense never argued—either in the trial court or in this court—that the evidence was insufficient to establish Noah

Outlaw's guilt of AAF to assault with a dangerous weapon (ADW)—a lesser included offense of second degree murder while armed [13]—the government contends that we may review only for plain error, *i.e.,* a clear miscarriage of injustice. *Compare United States v. McCray,* 140 U.S.App.D.C. 67, 69 n. 2, 433 F.2d 1173, 1175 n. 2 (1970) (per curiam) *with Abdulshakur v. District of Columbia,* 589 A.2d 1258, 1264 (D.C.1991). At trial, the prosecution never requested an instruction on the lesser included offense of accessory after the fact to ADW,[14] and there was arguably little, if any, reason for Noah Outlaw's counsel to address the question. Even assuming, without deciding, that the correct standard of review is "plain error," and that Noah Outlaw's conviction may therefore be set aside only if reversal is necessary to avoid a "clear miscarriage of justice," we conclude that affirmance here, in the absence of sufficient evidence to support a finding of guilt beyond a reasonable doubt, would run afoul of that exacting standard.

## III.

## CONCLUSION

For the foregoing reasons, each of Samuel Outlaw's convictions is hereby affirmed. Noah Outlaw's conviction for carrying a pistol without a license is affirmed. Noah Outlaw's conviction of being an accessory after the fact to second-degree murder while armed is reversed, and the case is remanded

*Id.* 268 A.2d at 574. On the basis of these facts, and others detailed in the opinion, (including the appellant's inculpatory statement to the police), the court concluded that the evidence was sufficient to establish that McLain was an accessory after the fact, in part because

[t]he murder weapon was the gun supplied to Powers by Matthews. It was this gun, together with the victim's own gun, that appellant took from Powers when the felons assembled at McCoy's house. Prior to appellant leaving the McCoy house at 9:00 p.m., he gave advice to the felons to guide them in avoiding police detection. After leaving, appellant hid Pecora's gun either in his own house or an empty house, and he kept the murder weapon in his personal possession until losing it in a dice contest.

*Id.* at 577. Obviously, the advice provided by McLain to his principals was part of a course of conduct which rendered him an accessory, and which went well beyond any acts or words attributed in this case to Noah Outlaw.

13. *See Hebron v. United States,* 625 A.2d 884, 884–85 (D.C.1993).

14. *Cf. Shelton v. United States,* 505 A.2d 767, 771 (D.C.1986); *see also State v. Chism,* 436 So.2d 464 (La.1983):

A person cannot be convicted as an accessory after the fact to a murder because of aid given after the murderer's act but before the victim's death, but under these circumstances the aider may be found to be an accessory after the fact to the felonious assault.

*Id.* at 468 (citations omitted).

to the trial court with directions to enter a judgment of acquittal as to that charge.

*So ordered.*