*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.    Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press*.

# District of Columbia
# Court of Appeals

**No. 24-CF-0043**

ELLIOTT WALLACE,

                          Appellant,

                                        **2022-CF2-005858**

**No. 24-CF-0156**

ANTOINE LAYNE,

                          Appellant,

    v.                                  **2023-CF2-002579**

UNITED STATES,

                          Appellee.

BEFORE: Deahl, Howard, and Shanker, Associate Judges.

## PUBLISHED ORDER
(FILED—February 12, 2026)

On consideration of appellant Antoine Layne's Motion for Leave to File Supplemental Brief on Insufficiency of the Evidence for Possession of Dimethylpentylone with the Intent to Distribute, it is

ORDERED that appellant Layne's motion is denied.

## PER CURIAM

SHANKER, *Associate Judge*, with whom HOWARD, *Associate Judge*, joins, concurring: "It is a basic principle of appellate jurisprudence that points not urged

on appeal are deemed to be waived." *Rose v. United States*, 629 A.2d 526, 535 (D.C. 1993). *See Comford v. United States*, 947 A.2d 1181, 1188 (D.C. 2008) (noting that arguments not raised in an opening brief are deemed waived and stating that "it is the longstanding policy of this court not to consider arguments raised for the first time in a reply brief" (citation modified)). "This principle should be observed especially where . . . the [party] appears to have deliberately conceded an issue as a matter of appellate strategy, rather than merely failing to argue the point inadvertently." *Rose*, 629 A.2d at 536. "Such self-restraint on our part is a corollary of our adversarial system, in which appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *Id.* at 536-37 (citation modified).

"That is how the adversary system works." *Id.* "In our adversarial system of adjudication, we follow the principle of party presentation." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020). Thus, "in both civil and criminal cases, in the first instance and on appeal, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Id.* (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)) (citation modified). Courts "do not, or should not, sally forth each day looking for wrongs to right. They wait for cases to come to them, and when cases arise, courts normally decide only questions presented by the parties." *Id.* at 376. "To put it plainly, courts call balls and strikes; they don't get a turn at bat." *Clark v. Sweeney*, 607 U.S. __, No. 25-52, 2025 WL 3260170, at *1 (Nov. 24, 2025) (per curiam).

"This is not to say an appellate court is absolutely precluded from reaching an issue *sua sponte*; it is not." *Rose*, 629 A.2d at 537. "But even when the courts have elected to do so, . . . they have done so only when a statute required it or when the record was not complex and resolution of the issue was easy, beyond serious debate." *Id.* (citation modified). In addition, "in criminal cases, departures from the party presentation principle have usually occurred to protect a *pro se* litigant's rights." *Sineneng-Smith*, 590 U.S. at 375. Otherwise, a criminal defendant "ordinarily must be bound by the actions of [their] counsel." *Rose*, 629 A.2d at 537. "As a general rule, our system is designed around the premise that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief." *Sineneng-Smith*, 590 U.S. at 375-76. Our discretion to consider points that a party did not squarely present on appeal is one that "we exercise with restraint, because we follow the principle of party presentation, where the parties frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Colbert*

*v. United States*, 310 A.3d 608, 616 (D.C. 2024) (quoting *Sineneng-Smith*, 590 U.S. at 375).

These venerable principles have a straightforward application in this case. Antoine Layne and his co-defendant, Elliott Wallace, were convicted following a jury trial of multiple counts arising out of their possession of narcotics.   Over three months after Mr. Wallace filed his opening brief in which he asserted an insufficiency-of-the-evidence claim as to his conviction for possession with intent to distribute (PWID) cocaine, Mr. Layne filed his opening brief, forgoing an insufficiency claim as to his conviction for PWID dimethylpentylone ("boot").   Mr. Layne was then appointed substitute counsel, who was provided the opportunity to file a supplemental opening brief.   Substitute counsel declined that opportunity, specifically representing that he was doing so "[a]fter reviewing the matter (including the previously-filed briefs)."   Mr. Layne then filed a reply brief, again omitting any attempt to even belatedly raise an insufficiency claim.

Then, at oral argument, a member of the division asked Mr. Layne's counsel why he did not assert an insufficiency argument.   Counsel directly responded that, "to be frank," his review of the case law demonstrated that if Mr. Layne failed to succeed on his challenge to the admission of a government expert witness, in light of that expert's testimony he did not have a persuasive insufficiency claim.   The member of the division opined that he thought an insufficiency argument would in fact be persuasive, explained what that argument looked like to him, and noted that he was "flummoxed" by counsel's decision to eschew such a claim.   Rather than backing off of his position and suggesting some oversight in omitting the claim, Mr. Layne's counsel reiterated that he had reviewed the relevant cases and was "telling the court" that he had concluded that his expert admission argument was strong but that if it failed, there was no point in making an insufficiency argument because the expert's testimony about the distribution quantity of the boot was "powerful" evidence for sufficiency purposes.

After oral argument, Mr. Layne moved for leave to file a supplemental brief raising an insufficiency claim.   In the motion, counsel candidly stated that his request was prompted by "Judge Deahl['s] inquir[y] about whether there was insufficient evidence to support" Mr. Layne's conviction; that counsel had been "illuminated by the panel's questions and comments"; and that, "[a]fter conducting . . . additional research," counsel came "to understand *the panel's wisdom* in questioning whether there was sufficient evidence to support Mr. Layne's PWID conviction" (emphasis added).   The government opposed Mr. Layne's motion.

Those are the relevant facts for consideration of Mr. Layne's motion, and they lead inexorably to the conclusion that Mr. Layne's counsel knowingly and intentionally decided to omit an insufficiency claim and that his belated request to raise the claim was driven by a division member's own evaluation of the unraised claim—that is, a division member's "turn at bat," *Clark*, 2025 WL 3260170, at *1. Certain things are *not* relevant to the consideration of Mr. Layne's motion: my, or anyone else's, views about the wisdom of counsel's decision; my, or anyone else's, views about the strength of the insufficiency claim; and sympathy for Mr. Layne with respect to the ramifications of his counsel's intentional decisions.

My dissenting colleague presents five points in support of his contrary position that the court should grant Mr. Layne's motion. They do not withstand even cursory scrutiny.

First, while, as a neutral arbiter, it is not my place to opine on the strength of Mr. Layne's unraised insufficiency claim, it is fair to say that resolution of that claim is certainly not "easy" or "beyond serious debate." *Rose*, 629 A.2d at 537. My dissenting colleague views the claim (without the benefit of a government response) as "strong" or "facially viable," but even he acknowledges that it is not an "easy one to resolve," *post* at 12, and he provides no authority for a "facially viable claim" exception to the party presentation principle. At the very least, Mr. Layne's insufficiency argument is clearly not "beyond serious debate" given that two attorneys declined to include the argument and one of those attorneys presented at least a plausible basis for that decision at argument. In any event, except perhaps for a case where an issue is "beyond serious debate," *Rose*, 629 A.2d at 537, it gets the order of operations exactly backward to suggest that an appellate court, appropriately restraining itself from sitting as a self-directed board of legal inquiry and research, should look first to the strength of an unpresented claim when determining whether to consider it.

*Sineneng-Smith* demonstrates as much. There, the claim for the defendant that the appellate court raised on its own was apparently so strong that the court unanimously reversed the relevant convictions on that ground. *United States v. Sineneng-Smith*, 910 F.3d 461, 485 (9th Cir. 2018), *vacated and remanded*, 590 U.S. 371 (2020). The claim, moreover, was of constitutional dimension. *See id.* at 469. None of that stopped the Supreme Court from flatly rejecting the appellate court's process, deeming the court's "radical transformation" of the case "well beyond the pale." *Sineneng-Smith*, 590 U.S. at 380. *See also Clark*, 2025 WL 3260170, at *1-*2 (finding violation of party presentation principle even where court of appeals concluded that the constitutional errors that the court identified on its own

involved "extraordinary failures" and necessitated a new trial).    Simply put, neither the strength nor the gravity of the unpresented claim can vitiate the fundamental principle that courts do not "sally forth each day looking for wrongs to right." *Sineneng-Smith*, 590 U.S. at 376.

Second, the cases my dissenting colleague cites in which we "permitted litigants to file supplemental briefs," *post* at 13, are all readily distinguishable.    I find it unnecessary to dig into the specifics of those cases because my colleague's own descriptions of them lay bare how starkly they differ from this case.    But at the very least, they did not involve a division member telling counsel, over counsel's *disagreement*, that an unraised argument was persuasive, and counsel then acknowledging that his request to raise the claim was based on his coming around to the "panel's wisdom."    That is the very definition of an appellate court interjecting itself into the adversarial process.    Thus, whatever discretion we have to consider points not raised on appeal, this is the quintessential case in which to decline to exercise it.    *See Rose*, 629 A.2d at 536 ("This principle [that issues not raised on appeal are deemed waived] should be observed especially where . . . the [party] appears to have deliberately conceded an issue as a matter of appellate strategy, rather than merely failing to argue the point inadvertently.").

Third, and relatedly, the cases the dissent cites where we sua sponte directed supplemental briefing are likewise fundamentally different.    None of them involved a division member identifying a claim that counsel affirmatively disavowed before turning around and seeking to adopt it.[1]    *See Sineneng-Smith*, 590 U.S. at

---

[1] I will address only *Outlaw v. United States*, 632 A.2d 408 (D.C. 1993). The defendant in *Outlaw* argued on appeal that the evidence was insufficient to support his conviction for being an accessory after the fact (AAF) to murder because, as a matter of law, one cannot be convicted of being an accessory after the fact to murder on the basis of actions taken while the decedent was still alive.    *Id.* at 410-11.    We concluded of our own accord that the evidence was insufficient to support a conviction of AAF to murder *or* to any lesser included offense.    *Id.* at 410.    In doing so, we characterized the more general sufficiency issue as "antecedent" to the narrower issue the defendant raised, *id.* at 410 n.7; and the case we cited for that principle, *United States Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447 (1993), spoke of the authority of courts to address issues related to the ones the parties raised but that the parties did not "lock horns over" in their briefs, *id.* at 446-47.    That is an entirely different situation from the one we have here.

379 (noting that defendant ultimately adopted the claim raised by the appellate court because "[h]ow could she do otherwise?  Understandably, she rode with an argument suggested by the panel.").   Nor is the dissent's invocation of the process set forth in *Anders v. California*, 386 U.S. 738, 744 (1967), persuasive.   In *Rose*, we specifically distinguished the *Anders* situation from the situation here: the *Anders* process is predicated on "the belief that the . . . defense lawyer should not completely give up the . . . client's cause—which that lawyer should be advocating—without a judicial check on such behavior," 629 A.2d at 534, but in a non-*Anders* situation, when defense counsel is serving in their "traditional role as advocate," "the adversary system should be allowed to function as such; the court no longer is needed, automatically, to act as an institutional failsafe," *id.*   And my dissenting colleague's assertion that Mr. Layne should not be "penalize[d]" for his counsel's "oversight" runs headlong into our holding that a criminal defendant "ordinarily must be bound by the actions of [their] counsel," *Rose*, 629 A.2d at 537, and the Supreme Court's pronouncement that "our system is designed around the premise that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief," *Sineneng-Smith*, 590 U.S. at 375-76.[2]

Fourth, to accept the dissent's argument that we should consider an argument raised by a division member because "this panel is ultimately going to have to decide this sufficiency claim in any event," *post* at 16, would be to sacrifice the adversarial process on the altar of efficiency.   Under the dissent's logic, the court should always identify, research, and resolve potentially meritorious arguments on its own, and even contrive claims or objections that were never asserted in the trial court, because

---

[2] The dissent appears to draw a distinction between Mr. Layne's first counsel and his substitute/current counsel in saying that initial counsel's omission of the insufficiency argument was an "oversight" and that substitute counsel is now seeking to rectify that "oversight" by briefing the potentially meritorious issue.   *Post* at 16. But, as set forth above, that is not at all what happened here.   As in *Sineneng-Smith*, counsel is of course now trying to brief the issue, to "r[i]de with an argument suggested by" a division member.   590 U.S. at 379.   We have no way of knowing why initial counsel omitted the argument, and the dissent's suggestion that it was due to a medical condition, *post* at 16, is brazenly speculative.   Regardless, what initial counsel did in the opening brief is entirely irrelevant, as substitute counsel declined an opportunity to brief the issue and *then insisted that that decision was intentional*.

the merits question will return to the court through an ineffective-assistance-of-counsel claim.    It barely warrants observing that that is not how our system works.

Fifth, the dissent is again unconvincing in arguing that the prejudice to the government in allowing Mr. Layne's supplemental brief would be minimal.   As an initial matter, it is simply incorrect that the government can "copy and paste" its response to Mr. Wallace's insufficiency argument, *post* at 17: the evidence relating to the two defendants was different, and, even assuming Mr. Layne's insufficiency argument is stronger than Mr. Wallace's—none of us know, because it has not been briefed—the arguments (involving different drugs) are necessarily distinct.    In any event, the prejudice to the government is not limited to inconvenience in this case; it stems more generally from its inability, if we were to grant Mr. Layne's motion, to trust that this court will honor fundamental features of the adversarial process. Where the court abandons its role as neutral arbiter and "sallies forth" on behalf of one party, the prejudice to the other party is complete.[3]

*        *        *

I have no doubt that the "stakes here are considerable," *post* at 19, if the evidence is indeed insufficient to support Mr. Layne's PWID conviction—a question on which, again, I express no view but that is at least (as the dissent agrees) not easy. But the stakes are *always* considerable in criminal cases, even if an unpresented claim would reduce a defendant's term of incarceration by just six months.   *See Deck v. Missouri*, 544 U.S. 622, 631 (2005) (noting "the gravity with which Americans consider any deprivation of an individual's liberty through criminal

---

[3] The dissent contends that we have reversed defendants' convictions based on insufficiency arguments that only their co-appellants raised, "without even providing the government an opportunity to address via supplemental briefing the sufficiency ruling's application to the parties who failed to raise it."   Perhaps my dissenting colleague missed this, but in both of the cases he cites—*Walker v. United States*, 982 A.2d 723 (D.C. 2009), and *Jennings v. United States*, 431 A.2d 552 (D.C. 1981)—the government *conceded* the insufficiency of the evidence in initial briefing, rendering supplemental briefing unnecessary.   *Walker*, 982 A.2d at 738; *Jennings*, 431 A.2d at 554-55 & n.3.   And at least in *Walker* (and seemingly in *Jennings* too, although the opinion is not clear), the government in its appellate brief expressly did not object to vacatur of the co-appellant's corresponding convictions. *See Walker v. United States*, Brief for Appellee United States of America, 2008 WL 7801195, at *70 n.61.   The government could not have been prejudiced by our adoption of its own concession.

punishment"); *Argersinger v. Hamlin*, 407 U.S. 25, 41 (1972) (Burger, C.J., concurring in the result) ("[A]ny deprivation of liberty is a serious matter."). Considerable stakes, however, do not justify dispensing with the adversarial process that is at the core of our system of justice.    That is why I voted to deny Mr. Layne's motion for leave to file a supplemental brief raising a claim of insufficiency of the evidence.

DEAHL, *Associate Judge*, dissenting: Several days after the panel heard oral argument in this appeal, Antoine Layne sought to file a supplemental brief raising the same claim his co-appellant had already raised in the initial round of briefing: that the evidence was insufficient to prove that he intended to distribute the modest amount of illegal drugs found on him during a routine traffic stop.    If Layne is right about that on the merits, and there is at least a strong argument that he is, his 17.5-year prison sentence would be reduced substantially.    Despite the fact that this court has often permitted and even sua sponte directed supplemental briefing in similar circumstances, my colleagues nonetheless deny Layne's request to brief his sufficiency argument.    I would grant that request and address Layne's sufficiency argument on the merits, so I respectfully dissent.

## Factual and Procedural Background

Let me first offer a brief primer on the facts before detailing the five main reasons we ought to permit Layne to raise his sufficiency claim now.    Layne was riding as a backseat passenger in a car that was pulled over by police officers for excessive window tinting.    During that stop, an officer saw Layne trying to kick what appeared to be a gun under the front passenger seat, and officers searched Layne and found about seven grams, or $200 worth, of "bath salts" on him.    Those drugs were in two small bags—each holding about an "eightball," or 3.5 grams a piece.    The driver and Layne's co-defendant, Elliott Wallace, was also searched and found with a similar quantity of drugs, though his was an unspecified mixture of bath salts and crack cocaine and—unlike Layne—his drugs were broken down into thirteen smaller baggies more suggestive of an intent to sell them.    Jawan Plummer was the car's owner and front seat passenger, and officers recovered a "little bit of weed" on him but so far as the record reveals he was never charged with any offenses.    After a jury found that both Layne and Wallace intended to distribute the drugs found on them, Layne was sentenced to 17.5 years in prison.    Both Layne and Wallace have appealed their convictions to this court.

In his opening brief, Wallace cogently and fairly persuasively argued that the government failed to present sufficient evidence that he intended to distribute, rather than personally use, the approximately seven grams of crack/bath salts mixture found on him.   Wallace and Layne were not in an open air drug market; they were not observed engaging in hand-to-hand or any other type of exchange suggestive of drug sales; they did not have any scales, cutting instruments, or any stash of little baggies and ties suggesting they were in the distribution business; and seven grams is simply not so great a quantity to supply an inference that he possessed those drugs with an intent to distribute rather than to use them himself (Wallace presented two disinterested witnesses who testified to his heavy crack cocaine use).   To put seven grams in some perspective, a nickel coin weighs about five grams.   *See* United States Mint, *Coin Specifications*, www.usmint.gov/learn/coins-and-medals/circulating-coins/coin-specifications;  https://perma.cc/JNV6-NMT6  (last visited Jan. 30, 2026).

When Layne filed his opening brief several months after Wallace, his counsel inexplicably did not develop or even cursorily adopt the same sufficiency argument that Wallace had made, despite the fact that Layne had what appeared to be a stronger claim: Layne's drugs were not broken down or packaged into individual baggies like Wallace's.   Shortly after filing that brief, Layne's counsel sought to withdraw her representation in this matter and "from all pending cases due to a medical condition."   This court granted that request and appointed substitute counsel, who indicated he would proceed on the filed brief rather than filing a new opening brief.

Several days after this court heard oral argument in the matter—and apparently prompted by some questions from the bench about why Layne failed to raise the same sufficiency claim that Wallace had—Layne sought leave to file a supplemental brief raising a sufficiency claim.   Whether to permit him to do so is left to our broad discretion, after taking all of the competing interests into account. *See Jacobson v. Clack*, 309 A.3d 571, 578 n.3 (D.C. 2024) (It is a "discretionary decision whether this court will 'elect' to address an argument first raised in a supplemental brief." (citation omitted)).

**Analysis**

The relevant interests strongly favor permitting Layne to file his supplemental brief despite the late hour at which he seeks to raise a new claim.   There are five principal reasons why: (1) Layne has a facially viable sufficiency argument, which is to say he has a viable argument that he was wrongly convicted and is serving an

unwarranted sentence; (2) we have routinely permitted litigants, including the government, to file supplemental briefs in similar circumstances; (3) not only have we permitted supplemental briefs on unraised claims in similar circumstances, but we have often directed such supplemental briefing sua sponte when the interests of justice required it; (4) this panel will ultimately have to resolve Layne's sufficiency claim in any event, the only question is whether we do that now or after a lengthy delay when Layne inevitably raises it as part of an ineffective assistance of appellate counsel claim; and (5) there is no serious prejudice to the government in us considering this claim, nor is any "party presentation" principle offended in doing so, particularly where Layne's co-appellant raised what is roughly the same sufficiency claim in his opening brief.   I will now elaborate on each of those five points, though the first point (on the merits of Layne's sufficiency claim) takes some time to flesh out, so bear with me.

First, it is evident—largely for reasons captured in Wallace's opening brief—that Layne has a strong sufficiency argument.   That is, I have serious doubts that the evidence, when viewed in the light most favorable to the government, is sufficient to conclude beyond a reasonable doubt that Layne intended to distribute the bath salts, or dimethylpentylone, that officers found on him.   The government's expert testified that, for all intents and purposes, bath salts were just a budget-version of crack cocaine, with roughly the same effects and usage, for about half the price.[1] The government's case that Layne intended to distribute the bath salts found on him was built largely on the quantity he had: about seven grams, or two "eight balls." The government's expert testified that those two eight balls would cost about $200 on the open market.[2]   That is not exactly a staggering amount of one's intoxicating substance of choice to buy for personal use—drinkers routinely buy cases of wine and beer, or multiple handles of liquor, well in excess of $200 with nobody accusing them of being distributors (just visit the Costco in Northeast D.C. if you doubt me).

---

[1] Layne and Wallace both challenge in the pending appeal the trial court's decision to permit this witness to testify as an expert on dimethylpentylone, which he appeared to be unable to pronounce.   I offer no comment on the merits of that argument.

[2] More specifically, the government's expert testified that one eight ball of crack cocaine generally sells for $150 to $225 in the District, and that bath salts sell for half the price of crack cocaine.   That puts the price of two eight balls of bath salts at somewhere between $150 and $225.   The government's expert also explained that an "eight ball" gets its name from the fact that it's an eighth of an ounce, which equates to about 3.5 grams.

Charlie Sheen once famously recounted that during his frequent crack-cocaine binges he "was bangin' seven-gram rocks" per session—exactly what Layne had on him—"and finishing them because that's how I roll . . . . I have tiger blood, man." *Charlie Sheen: In His Own Words*, 20/20 (ABC television broadcast Mar. 1, 2011). And of course, Layne did not need to smoke seven grams in one sitting for the bath salts he had to be for personal use—drug users are not strangers to the economies of scale or to preparing for the week ahead.[3]

Also, consider that (1) Layne was not in any open air drug market or seen in any hand-to-hand exchanges—he was simply riding as a backseat passenger in a car that was pulled over in a routine traffic stop; (2) the two eight balls Layne had on him were not "broken down for street sales" and divvied into smaller hits, as the government's expert testified one would expect them to be if Layne were selling them; and (3) there was no evidence that Layne even had the tools necessary to break the bath salts down for individual sales, i.e., the government had no evidence that Layne had any little baggies, cutting implements, or digital scales—the types of things we often stress as indicative of an intent to distribute.  *See, e.g.*, *Buchanan v. United States*, 165 A.3d 297, 303 (D.C. 2017) (highlighting detective testimony about how "the scale, nail file, small zip-lock bags, and other items found [on the defendant] are tools commonly used to separate and package drugs for distribution.").

---

[3] The government's expert repeatedly testified that the quantity of drugs on Layne and Wallace was "more consistent with" distribution than personal use, but that is hardly the stuff of proof beyond a reasonable doubt (it speaks to a mere probability).   That expert more forcefully said on a single occasion that the quantity of drugs "isn't consistent with personal" use, but he then explained exactly what he meant: "you're not going to smoke an eightball at one time.   You would kill yourself."   It seems to me that the government's expert had such a cribbed understanding of what "personal use" means that his testimony on this point was roughly irrelevant.   The drinker who buys a case of wine, or two handles of liquor, would likewise die if they drank it all in one sitting, but that does not mean the wine or liquor is not for their personal consumption.   There is a world of difference between whether something is for personal consumption and whether it can be consumed in one sitting, the expert's conflations of those two things notwithstanding.  *See McRae v. United States*, 148 A.3d 269, 273 (D.C. 2016) ("[W]e do not think it can be maintained, that four-fifths of an ounce of marijuana exceeds a reasonable supply for a single user (even if no one would be likely to smoke all of it in one lazy, hazy weekend).").

To be clear, the government's case for distribution did not rely exclusively on the quantity of bath salts that Layne had on him, nor do I see Layne's sufficiency claim as an easy one to resolve.   Beyond the quantity of drugs, however, there was not a whole lot else pointing to any intent to distribute: (1) There was a gun in the car that the jury reasonably concluded was in Layne's possession, and drug dealers are known to carry guns.   But a lot of people who are not drug dealers also carry guns outside the home, which is constitutionally protected activity.   *See generally N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022); (2) Layne also had $284 in cash, which is a decent but not particularly unusual amount of cash for somebody to have on them.   And that cash was generally in large denominations—ten $20s and one $50 accounted for $250 of it, with two $10s and fourteen $1s making up the rest—whereas the government's expert explained that "[h]aving lots of smaller bills" is more typical of street level dealers; (3) Then there's the fact that Wallace, like Layne, also had about two eight balls on him, supplying some conceivable inference that maybe Wallace and Layne were part of a joint distribution scheme.   But Wallace was also a very heavy crack user.   Both his neighbor and his boss testified without any serious impeachment that Wallace regularly smoked crack, with his neighbor saying "every time I've seen him" he was smoking crack.   So to the extent that one can infer that birds of a feather flock together, that inference seems to just as readily support the conclusion that Layne possessed his bath salts for personal use—recall the third passenger in the car, Plummer, had just a "little bit of weed" on him too—rather than distribution.

That is all to say that Layne's sufficiency argument strikes me as a viable one that we ought to resolve, and we more or less already have briefing on it by way of Wallace's briefing.   This court has never upheld a distribution conviction on such slim evidence, and we have reversed distribution convictions even when the evidence was considerably stronger than what the government presented here.   *See McRae*, 148 A.3d at 273-74 (concluding there was insufficient evidence of an intent to distribute where defendant possessed 22.7 grams of marijuana, a digital scale, 175 empty Ziplock bags, and a loaded handgun, observing that the mere fact "[t]hat the marijuana had a potential retail value of around $220 or $230 if it were sold by the gram does not mean it was too much for one user to acquire for his own consumption").   The most material difference between Layne's case and Wallace's makes Layne's sufficiency argument considerably stronger than Wallace's, given that Layne's bath salts were not packaged in any way that suggested he intended to sell them.   Plus the stakes of this claim are enormous given that the bulk of Layne's 17.5 year sentence stems from this being a distribution offense.   Ten years of his sentence are for his "possession with intent to distribute" bath salts and his "possession of a firearm during a crime of violence" convictions, with the intent to

distribute being a predicate of the latter charge (unlike possession with intent to distribute, simple possession is not a crime of violence).

Second, we have often permitted litigants, including the government, to file supplemental briefs in similar circumstances. That is not to say that we consider claims raised for the first time in supplemental briefing willy nilly[4]—it is no trivial thing to request what is effectively a second round of briefing. But when the relevant interests and equities favor doing so, we operate from a place of reason, not rigidity. While it is difficult to catalog just how frequently we permit parties to raise new claims and arguments through supplemental briefing, given that we tend to do that through unpublished orders, consider three potent examples: *Blades v. United States*, 200 A.3d 230 (D.C. 2019); *Mayo v. United States*, 266 A.3d 244 (D.C. 2022), *partially vacated and superseded by Mayo v. United States*, 315 A.3d 606 (D.C. 2024) (en banc); and *Agnew v. United States*, 813 A.2d 192 (D.C. 2002).

In *Blades*, about eight months after appellant filed his opening brief, and five months after the government filed its response, the appellant sought to file a supplemental brief raising an entirely new claim for relief: that his constitutional right to a public trial during jury selection was violated. 200 A.3d at 236-37. There was no intervening law or circumstances that prompted counsel's tardy request; as she explained in her motion to file a supplemental brief, she had simply "failed to raise a preserved issue of constitutional importance in Appellant's opening brief," and it was "essential to raise it on appeal in order to provide effective assistance to Mr. Blades." With no particular fanfare, a panel that was otherwise divided on the merits unanimously agreed to consider that late-breaking argument, noting that, because of "the importance of effective assistance of counsel, we elect to consider the 'public-trial' issue raised in the supplemental brief." *Id.* at 237. I see no reason to depart from that precedent—a sufficiency claim is likewise rooted in a constitutional right to due process, *In re Winship*, 397 U.S. 358, 364 (1970), and permitting Layne's counsel to raise the claim even at this late hour is essential to ensuring that Layne has the effective assistance of appellate counsel, which is precisely the concern that prompted this court to consider the late-breaking claim in *Blades*.

---

[4] We could grant Layne's request for supplemental briefing and still refuse to consider his sufficiency claim on the merits. *See Jacobson*, 309 A.3d at 578 n.3. But I would not put the parties through a futile exercise, so to me the question of whether to permit supplemental briefing fairly reduces to the question of whether we should resolve Layne's sufficiency claim on the merits.

Even more recently, it was the government who sought to raise a late-breaking argument in *Mayo*, and again an otherwise divided panel of this court (yours truly included) unanimously permitted it to do so with no apparent reservation.   In its opening brief in *Mayo*, the government's only defense of the trial court's denial of Mayo's motion to suppress was that Mayo had not been seized by officers until after he discarded the incriminating evidence.   With briefing completed, and less than a week before oral argument was scheduled, we agreed to hold the case in abeyance while the Supreme Court considered a similar question about what constitutes a seizure in *Torres v. Madrid*, 592 U.S. 306 (2021).   After the Supreme Court decided *Torres*, we directed supplemental briefing so the parties could address how *Torres* affected the case.   There was no debate about that—the parties agreed that *Torres* foreclosed the government's argument that Mayo had not been seized.   But the government then sought to pivot to an entirely new argument that *Torres* had no bearing on, arguing for the first time that officers had reasonable articulable suspicion to seize Mayo in any event.   Mayo vociferously objected to that late-breaking defense of the trial court's ruling where the government had every opportunity to raise it in its opening brief and *Torres* did not have any impact on the issue.   And yet, another unanimous panel of this court permitted the twenty-fifth hour pivot to permit the government to raise a new issue that would later be decided by the en banc court with nary a judge voicing any objection to resolving it.

In *Agnew*, we took the more drastic step of sua sponte reopening an appeal and permitting supplemental briefing *after we issued our opinion* in the matter.   In that case, the clerk of this court raised concerns within two days of this court's initial decision that appellant's counsel had been ineffective and should not be paid for his court-appointed service given the "unusual similarity between" the brief he filed and one of the earlier-filed co-appellant's briefs.   813 A.2d at 193 n.1.   We were unsatisfied with counsel's self-exonerating explanation and responded by removing counsel and appointing new counsel.   Upon new counsel's motion, we recalled the mandate and permitted additional briefing on a sufficiency claim that the original counsel had not raised.   *Id.*   This court ruled in the appellant's favor on that twenty-fifth hour sufficiency argument and reversed appellant's conviction. *Blades*, *Mayo*, and *Agnew* all provide compelling support for permitting Layne to raise his sufficiency argument now.

Third, not only have we permitted supplemental briefs on unraised claims in similar circumstances, but we have often directed them sua sponte, even after oral argument: "[N]o matter whose ox is gored, this court has frequently requested post-argument briefing of issues not adequately raised by counsel, to the end that, after both parties have been fully heard, the court is in the best position to render a sound

decision." *Randolph v. United States*, 882 A.2d 210, 226 (D.C. 2005); *see also Robinson v. United States*, 100 A.3d 95, 111 n.40 (D.C. 2014) (same, noting that "we often have stated" as much); *Gilliam v. United States*, 80 A.3d 192, 205 n.36 (D.C. 2013) (same); *Perez v. United States*, 968 A.2d 39, 92 (D.C. 2009) (same); *Anthony v. United States*, 935 A.2d 275, 282 n.10 (D.C. 2007) (same).

In *Outlaw v. United States*, for instance, appellant challenged the sufficiency of the evidence to sustain only his conviction for "accessory after the fact," or AAF, "to murder," but he did not dispute "in the trial court or in his appellate counsel's brief" the sufficiency of the evidence to sustain a lesser included offense of AAF to assault with a deadly weapon. 632 A.2d 408, 410 (D.C. 1993). "At oral argument, however, members of the court raised, on their own initiative, the question whether the evidence was sufficient to support his conviction of AAF to any offense whatever," including the AAF assault with a deadly weapon charge he raised no challenge to. *Id.* "After argument, the court entered an order inviting the parties to file supplemental memoranda addressing this issue"—the appellant did not even request it, unlike here—and we ultimately ruled that the evidence was insufficient to support appellant's conviction for AAF to the lesser included assault with a deadly weapon charge that he raised no challenge to prior to the panel's prompting. *Id.*

In *Randolph*, it was the government who dropped the ball by failing to raise any argument that the complained-of error was harmless. We directed supplemental briefing on that question, and then concluded that there was indeed error, but that it was harmless as to one (but not the other) of the appellants. 882 A.2d at 225-27. Similarly, in *Boyd v. United States*, three months after oral argument we sua sponte directed supplemental briefing on a *Brady* claim that appellant did not raise in his briefs, but oral argument apparently gave us some concerns about, and we then held another argument as to that claim and ultimately resolved it on its merits. 908 A.2d 39, 49 (D.C. 2006).

Relatedly, this court sometimes has an *obligation* to direct briefing on issues that counsel has missed. Per the process set forth in *Anders v. California*, when a criminal defendant's appellate counsel detects no non-frivolous bases to appeal, they are required to file a pleading with this court explaining their efforts to identify a viable issue and why none exists. 386 U.S. 738, 744 (1967). This court then has an independent obligation to conduct "a full examination of all the proceedings, to decide whether the case is wholly frivolous," *id.*, and when we detect some non-frivolous issue, we are obliged to direct counsel to address it (often after appointing new counsel), *see, e.g.*, *Bell v. United States*, 457 A.2d 390, 391 (D.C. 1983) (denying counsel's *Anders* motion to withdraw and directing briefing on four distinct

issues identified by the court on its own review).   Here, of course, defense counsel himself is seeking to brief a potentially meritorious issue that prior counsel—perhaps owing to the same medical condition that prompted her to withdraw from all of her cases—inexplicably did not raise despite co-appellant raising it on weaker facts.[5]   I see no good reason to stand in his way or to penalize Layne for his counsel's earlier oversight.

Fourth, this panel is going to have to decide this sufficiency claim in any event—the only question is whether we do that now or after some considerable delay and extra procedural rigmarole via an ineffective assistance of appellate counsel claim.   The way ineffective assistance of appellate counsel claims typically work in the District is that, after a panel of this court issues its ruling, the appellant must file a motion to stay or recall the mandate with the same panel explaining why he believes his appellate counsel was ineffective.[6]   *See Long v. United States*, 83 A.3d 369, 377-78 (D.C. 2013) (detailing the process).   If there is potential merit to the claim, the panel then has an obligation to "reopen[] the movant's appeal in order to fully explore and then decide whether there was ineffective assistance of counsel on the first appeal."   *Id.* at 378.   In this case, that question is going to reduce down to the merits of Layne's sufficiency claim, i.e., the ineffective assistance of counsel question will be coextensive with the question of whether there was sufficient evidence to convict Layne of possession with intent to distribute bath salts.   If there was not, there was no conceivable reason for his appellate counsel not to have made that argument: it was already ably made by co-appellant Wallace, it could have been adequately developed in a sentence or two adopting Wallace's argument and noting that Layne's case was even stronger, and that sufficiency claim would have afforded Layne greater relief than any of the issues he did raise (given that a successful

---

[5] While the fault principally lies with Layne's earlier counsel for failing to raise the sufficiency argument in the opening brief, replacement counsel also shoulders some modicum of blame.   He had the opportunity to file a new brief or proceed on the filed brief, and he chose the latter, though he now tries to remedy that error in judgment.

[6] It is not entirely clear to me that Layne must wait for our initial decision in his appeal, or whether he can raise an ineffective assistance of appellate counsel claim now, though he would presumably need substitute counsel to do that.   I have not studied the matter enough to say anything beyond that typically those claims arise after the initial decision, no doubt for the practical reason that appellate counsel would generally be conflicted from raising a claim that targets their own ineffective assistance.

sufficiency claim bars a retrial, and the claims that Layne raised on appeal would not).   There was no rational strategic reason for failing to raise that claim.   Given that we will find ourselves right back in this same spot of resolving this sufficiency claim after however long it takes to resolve Layne's initial appeal, I think the far better approach is to entertain the claim now, without that unnecessary delay.

Fifth, there is no serious prejudice to the government in us considering this claim now—it would be a mere and only slight inconvenience to respond to Layne's sufficiency argument, and as I have said, the government is going to have to do that eventually anyhow.   The government has largely already responded to Layne's sufficiency argument by way of responding to Wallace's sufficiency argument—it will more or less be a copy-and-paste job with only a couple of material differences to address.   In fact, on multiple occasions this court has reversed defendants' convictions based on sufficiency arguments that only their co-appellants raised, without even providing the government an opportunity to address via supplemental briefing the sufficiency ruling's application to the parties who failed to raise it.   *See Walker v. United States*, 982 A.2d 723, 738 (D.C. 2009) (reversing convictions of two appellants for insufficiency of the government's evidence, even though only one of the appellants challenged his convictions on that ground); *Jennings v. United States*, 431 A.2d 552, 555 n.3 (D.C. 1981) (reversing convictions of three appellants on insufficiency grounds raised by only one of the appellants).

It is true, as the government argues, that this court generally does not address claims raised for the first time in reply or supplemental briefs, despite our undisputed discretion to do so.   *See Comford v. United States*, 947 A.2d 1181, 1188-89 (D.C. 2008).   But that is largely because it would be unfair to rule on an issue that the opposing party has not had a fair opportunity to respond to.   *Buitrago v. D.C. Dep't of Emp. Servs.*, 320 A.3d 332, 337 (D.C. 2024) (explaining that the "driving principle is that a party should not be able to raise a new argument at a point where the opposing party does not have a fair opportunity to respond to it").   And because such late-breaking claims tend to be facially meritless, we do not put opposing counsel through an apparently pointless exercise of a second round of briefing on a meritless issue, plus we would rather save ourselves the time of explaining in chapter and verse precisely why the claim is meritless where the offending party could not even be bothered to raise the claim in a timely manner in the first place.   *See Bland v. United States*, 153 A.3d 78, 80 n.8 (D.C. 2016) (panel denied a post-decision motion to file a supplemental brief, briefly explaining why "even if its untimeliness were to be excused, appellant could not" succeed on the merits of his claim).   That calculus changes drastically where an appellant tardily raises a facially viable claim

that he was wrongly convicted of charges that he is serving roughly a decade in prison for.

And to the extent the government complains that permitting supplemental briefing now would offend some principle of "party presentation" because Layne's request seems to have been prompted by a question at oral argument—from me— about why he did not raise the same sufficiency argument that Wallace did, that is an indefensible view.   To be sure, appellate judges should not act as "self-directed boards of legal inquiry and research," *Rose v. United States*, 629 A.2d 526, 536 (D.C. 1993), or as "pigs, hunting for truffles," *Murthy v. Missouri*, 603 U.S. 43, 67 n.7 (2024), scouring the record for arguments that the parties did not make and enlisting amici to make those arguments, *see United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) (reversing appellate court's decision that was based on an argument that no party had raised and that the appellate court had directed three amici to address five months after the case was argued).

But neither should we act as ostriches with our heads buried in the sand, avoiding asking the most obvious of questions—like why one appellant did not make the argument raised by his co-appellant—for fear of giving the parties ideas.   *See Boyd*, 908 A.2d at 49, 63 n.35 (directing post-argument supplemental briefing on claim that no party raised due to concerns with government counsel's candor at oral argument); *Agnew*, 813 A.2d at 193 n.1 (accepting post-decision supplemental briefing prompted by this court's own affirmative inquiries).   As discussed thoroughly above, our precedents do not support such a rigid application of any party presentation principle, where we have frequently directed supplemental briefing on issues critical to the proper resolution of a case.   *See Sineneng-Smith*, 590 U.S. at 376 ("The party presentation principle is supple, not ironclad.   There are no doubt circumstances in which a modest initiating role for a court is appropriate.").   We should not let our adversarial process degenerate into an adversarial fetish.[7]

---

[7] Notably, one of the claims that Layne raises on appeal is that the trial judge erred "by improperly acting as a partisan" by personally questioning multiple witnesses in ways that bolstered the government's case against him.   I do not see any merit to that argument because our precedents recognize that it is generally within a trial judge's discretion to personally question the witnesses, even in so one-sided a fashion as the trial judge did in this case.   *See Womack v. United States*, 350 A.2d 381, 383 (D.C. 1976) ("To what extent the court will intervene [to question a witness] is a matter of discretion.").   But I note the clear tension between the government's defense of the trial judge's self-injection into the examination of

For those reasons, I dissent.   Layne seeks to raise a viable claim that he was wrongly convicted for a distribution offense that accounts for the bulk of his 17.5 year sentence.   The stakes here are considerable, and the reasons for granting Layne permission to file his supplemental brief far outweigh any interest on the other side of the ledger.   I would grant Layne's motion for leave to file a supplemental brief, permit the government to file a supplemental response, and resolve Layne's sufficiency claim on its merits.

---

witnesses and the more rigid party presentation principles it now espouses in its opposition to Layne's request to file a supplemental brief.